## THE NEW YORK.[1]

### BARRETT et al. v. THE NEW YORK.

### HUMPHREYS et al. v. SAME.

*(District Court, E. D. New York.* April 9, 1888.)

SALVAGE—VESSEL AT DOCK—FIRE—COMPENSATION.

The steam-ship New York, loaded with cotton and other goods, lay on the upper side of the Morgan Line pier, on the occasion of the breaking out of fire on that pier in February, 1887. The fire spread along the pier with remarkable rapidity, and threatened the New York. which had no steam up, and could not get away by her own motive power. The tug Jason, which was near the slip when the fire broke out, and the tug Goodwin, which had laid up for the night in the slip, took hold of the New York, and towed her out into the stream, accomplishing the service in about an hour. The New York was entirely unharmed. Other tugs which might have performed the service were in the vicinity when the fire broke out. The value of the New York and cargo was some $433,000. *Held,* that each tug should be awarded $2,000 as salvage.

In Admiralty. Libel for salvage.

*Wing, Shoudy & Putnam,* for Barrett and others.

*Carpenter & Mosher,* for Humphreys and others.

*Chas. H. Tweed* and *R. D. Benedict,* for the New York.

BENEDICT, J. This is one of several actions for salvage instituted in this court to recover for services rendered on the occasion of the disastrous fire that occurred at the pier of the Morgan Line of steamers in the North river, on the 28th day of February, 1887. The fire seems to have broken out on a lighter lying at the end of pier 37. On the south side of that pier lay the steamer Lone Star; on the north side of that pier lay the vessel here proceeded against, the steamer New York, with a full cargo on board, consisting of cotton, wine, and other goods. When the fire broke out a strong wind was blowing from the north-west, in fact, a gale. Pier 37 was covered by a shed, the front doors of which were open, and which was full of cotton, piled 20 feet high. The consequence was that the fire, fanned by the gale, spread with great rapidity up the pier, so that not only the cotton in the shed, but also the shed, the pier, and the Lone Star herself were consumed. The fire came so fast as to drive the firemen off the pier, and compel them to take refuge on a tug. According to one witness, it came up the pier towards the New York nearly as fast as a man could walk. When the fire broke out the steamtug Jason, seeing it, at once turned back from her course, and pushed into the slip for the purpose of towing the New York away from the burning pier. The master of the steam-ship hailed her, as she came near, to take a line from the steamer, which was promptly done. The Goodwin, a more powerful tug, had laid up for the night in that slip,

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

and when her engineer came down to her at 6 o'clock in the morning the fire was then burning. The master of the tug was not there. The engineer of the Goodwin at once took charge of her, put the fireman in charge of the engine, cast off the lines, and moved up the slip to the relief of the New York. As she passed up the slip she met the Jason coming in. When the Jason took a line from the New York, the Goodwin swung around and took a line from the Jason, and both these tugs in this way quickly towed the New York out of the slip to a place of safety in Hoboken. The service was performed so promptly that the steamer sustained no damage whatever. Neither of these tugs would have been able to tow the New York alone under the circumstances. At the time these two tugs towed the New York out of the slip, the lighter Hope, loaded with cotton, and on fire, was crossing the slip, scattering sparks plentifully. The tugs, however, escaped injury from her, except, perhaps, a slight scorching. When the tugs struck the tide the Jason took a list to port, and the ship moving out came against her, so that for a moment she was in peril of being capsized. This peril was also escaped without injury. For the services so rendered each of the tugs mentioned claims salvage compensation. That they are entitled to salvage is not disputed, but a great difference exists as to the sum proper to be awarded. This difference seems to arise from a difference in the estimation of the peril to which the steamer was exposed. There is no disputing that where the steamer lay she was in danger of being destroyed by fire. Neither is there any room for doubt that her only way of escape from destruction by fire was by being removed from the burning pier. The fire department could do nothing. The firemen were driven from the pier by the fire. The steamer could not be saved by water. She had no steam-power. Her removal from the pier by tugs was the necessity of the occasion. The master of the steamer has endeavored to make it appear that, if he had failed to obtain tugs, he could have warped the steamer to a place of safety. I do not doubt that if he could have warped the steamer across the slip he would have done so in the absence of tugs, but the evidence satisfies me that the steamer could not have been warped away from the pier in time. No boat was present ready to run a line to the opposite pier. It was impossible for a man to carry a line around by the bulk-head, and I conceive it to be certain that steam-tugs were the only instruments by which it was possible for the steamer to be saved.

A more serious question of fact, and one which must largely affect the amount of the award, is whether the two tugs that saved the steamer were the only tugs present able and willing to render the service. On the part of the libelants the contention is that, when the Jason arrived on the ground, there were tugs about the mouth of the slip, but none of these dared to go into the slip. It is therefore insisted that but for the services rendered by these two tugs that did dare, the steamer would certainly have been destroyed. The evidence no doubt proves that other tugs arrived off the slip before the Jason did, and that no tugs save the Jason and the Goodwin went to the aid of the steamer. But the evi-

dence also proves that neither the Jason nor the Goodwin incurred any serious danger in going to the aid of the steamer. It therefore seems reasonable to attribute the failure of other tugs to go into the slip to some other cause than fear of danger. In the absence of any danger in the undertaking, it may be properly inferred that if the Jason and the Goodwin had not gone to the assistance of the steamer when they did, other tugs then at the mouth of the slip would have done so. The importance of the fact of the presence of other tugs able to render assistance to vessels in danger of burning at the piers, in determining the extent of the peril, is pointed out in the case of *The Indiana*, 22 Fed. Rep. 925. Of course, the degree of importance to be attached to that fact must vary with the circumstances. It is of less importance in this case than in some, because in this case the fury of the fire, and the rapidity of its approach, made the question of securing the relief by tugs one of minutes. Not only was it necessary that tugs should get a line to the steamer, but that this should be done in time to enable the fasts which held the steamer to the pier to be cast off by those on board before they were driven ashore by the flames, as they were certain to be, unless the vessel was immediately removed. Delay would have kept the steamer at the pier, and there she would have been for the most part destroyed. Such was the fate of the steamer Lone Star, on the other side of the pier. The New York was not in as immediate danger as the Lone Star, because the Lone Star was near the place where the fire broke out, and the wind blew the flames more directly upon her. Still, the position of the New York, conceded by the claimants to be one of serious peril, was, in my opinion, one of very great peril; but it was not one where destruction would certainly have resulted from the absence of the libelant tugs, for the reason that there was a chance of her being relieved by the other tugs then at the mouth of the slip. One of these tugs did go in, and tow out ahead of the New York the lighter that lay at the pier between the New York and the end of the pier. Owing to the need of dispatch, the presence of these two tugs contributed in a large degree to save the steamer unhurt, but I am unable to find as a fact that if they had been absent the steamer would have burned. This conclusion in regard to the peril from which the steamer was rescued by these tugs, of course, goes to reduce the amount of salvage proper to be awarded for their services.

Of the cases cited by the claimants in support of their contention that $1,000 is a sufficient reward for both these tugs, it is sufficient to notice the case of *The Gallego*, 30 Fed. Rep. 271. That is a case where the same owners who are claimants here were there the salvors, and were awarded by this court the sum of $25,000 for taking the Gallego into Havana. That case does not seem to me authority in support of an award of $1,000 in a case like this. One important difference between the two cases is the extent of the peril. The fierce flames on the pier, approaching the New York nearly as fast as a man could walk, have no parallel in the case of the Gallego. The Gallego, if not fallen in with, would in all human probability have been lost; but she had a reasonable chance of being fallen in with. The chance open to the New York was for a few mo-

ments only. In those few moments fortunately these two tugs appeared, and by their exertions property valued at $433,000 was saved from the danger of substantial and immediate destruction. The libelants in support of their contention that 4 per cent. or $17,320 should be awarded, cite the case of *The Tees*, 1 Lush. 505, where £1,000 was awarded to a tug for hauling a burning vessel valued at £12,350 out of a dock into the river, and to a place of safety, at some risk of life. But the report of the case of *The Tees* is too meager to entitle it to be cited as authority for awarding $17,320 in this case. The extent of daring displayed in the case of *The Tees* is not stated, nor can the extent of the peril be ascertained from the report. Indeed, cases of salvage can be seldom compared with advantage. It is the aim of this court, in all cases of saving vessels from fire at the piers, to give such rewards as will insure on such occasions the most prompt, energetic, and daring effort of those who have it in their power to furnish aid and succor. With that in view, taking into consideration the ordinary character of the services rendered by the tugs, and the short time occupied; considering also the promptness displayed, and the success attained; and mindful of the large value of the property saved, and the extent of the peril to which it was exposed; and observing that, although the sum earned by those tugs by this hour's labor will be very many times greater than the sum they would have charged for the same labor rendered in ordinary towing, their services saved the owners of the steamer from what might otherwise have been a very large loss, I award to each of the tugs the sum of $2,000.