### THE JEFFERSON.

#### (District Court, E. D. Virginia. June 17, 1910.)

SALVAGE (§ 31*)—AMOUNT OF COMPENSATION—SERVICES TO BURNING SHIP IN DRY DOCK.

    The masters and crews of three tugs awarded the total sum of $6,000 for salvage services rendered to a steamship, which caught fire while in a dry dock from burning buildings in the shipyard; the tugs, at the request of the superintendent of the yard, having rendered the most effective service in extinguishing the fire and preventing a possible loss of $140,000, the service having been rendered with great efficiency in freezing weather, with some risk to life from falling wires and timbers and considerable to health from exposure.

    [Ed. Note.—For other cases, see Salvage, Dec. Dig. § 31.*

    Awards in federal courts, see note to The Lamington, 30 C. C. A. 280.]

In Admiralty. Suit by E. W. Simmons and others, composing the officers and crews of the tugs Helen, Alice, and James Smith, Jr., against the steamship Jefferson. Decree for libelants.

See, also, 215 U. S. 130, 30 Sup. Ct. 54, 54 L. Ed. ——.

Thorp & Bowden, for libelants.

Loyall, Taylor & White, for respondent.

WADDILL, District Judge. The libel in this case was filed by E. W. Simmons, master of the steam tug Helen, for himself and others interested as salvors, against the steamship Jefferson, her tackle, apparel, and furniture, owned and claimed by the Old Dominion Steamship Company. Subsequent to the filing of the libel, the crew of the tug Helen, and the masters and crews of the steam tugs Alice

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and James Smith, Jr., duly filed their petitions, setting up their claims as salvors; the purpose of said libel and petitions being to recover salvage claimed to be due for extinguishing a fire on the Jefferson on the evening of the 25th of December, 1906, while she was undergoing repair in the dry dock at Newport News, Va. The claimant steamship company duly filed exceptions to the libel and petitions, raising, among other things, the question as to whether or not the services for which libelant and petitioners made claim was a salvage service; the Jefferson at the time being in a dry dock for reconstruction, lengthening, and repairs. After full argument before this court, the exceptions were sustained, and the libel and petitions dismissed. 158 Fed. 358. This decision was reversed by the Supreme Court of the United States on appeal. 215 U. S. 130, 30 Sup. Ct. 54, 54 L. Ed. ——. The case is now under consideration upon its merits; the parties respectively having adduced their testimony since the return of the case from the Supreme Court, and argued and submitted the same.

The right of the libelant and petitioners to recover is conceded, in the light of the decision of the Supreme Court, and the amount for which a recovery should be had is alone in controversy. The fire in the shipyard at Newport News, on account of which the service sued for was rendered, was a very serious one. It broke out on the evening of the 25th of December, 1906, about 4 o'clock, a high northwestern wind prevailing. A large building known as the carpenter's shop was totally destroyed, together with its contents, and the power house and plant and machine shop of the yard greatly endangered. The direction of the wind carried the fire towards the dock where the ship was, and away from the buildings aforesaid, in the yard, and the ship quickly caught fire; the same breaking out on its starboard quarter, she being stern in to the dock, and in close proximity to the burning building. The superintendent of the shipyard's docks called upon the three tugs to render assistance in the effort to save the Jefferson, and they promptly responded. The fire department of the city of Newport News, with three fire engines, about a dozen or more regular firemen, and quite a number of volunteer firemen, rendered timely and valuable service in controlling the fire and saving the buildings in the yard, with the exception of the large building aforesaid, and in part aided in extinguishing the flames on the Jefferson. The employés of the shipyard likewise to some extent aided in putting out the fire upon the ship; but, in the view taken by the court, the libelant and petitioners, with the fire apparatus of the three tugs, did by far the greater service, and were chiefly instrumental in subduing the fire upon the ship. The service rendered by them was really what prevented the burning of the ship entirely, though undoubtedly some assistance was rendered from the other two sources mentioned. A great crowd was present at the fire, and much excitement prevailed, and there is considerable conflict in the testimony as to just what did occur. It does not necessarily follow that this difference arises from anything but the viewpoint from which the several witnesses testified. The city fire department's witnesses naturally exaggerated what their department did, and the same is doubtless true of

those from the shipyard and the tugs; but they were neither, in the positions in which they were severally placed, able to tell what the others did., In some instances they were on opposite sides of the dry dock, the pier, or the ship on fire, and necessarily could not know what the others were doing.

Viewing the entire testimony, however, giving to each witness credit for good faith in what he said, the court is convinced, so far as the fire on the steamship was concerned, that the water thrown from the three tugs was the real and efficient cause that extinguished the fire. They were at the scene when the ship took fire, were able to and did lie on both sides of the dry dock containing the ship. They were especially equipped for fighting fire, being Chesapeake & Ohio Railway Company tugs, used not only for towing, in connection with their business at Newport News, but kept as harbor tugs, and equipped for protecting the company's property from fire, and by means of their powerful pumps and their hose, connected with that of the shipyard, they were enabled to throw constantly large streams of water upon the burning ship from different sides and locations, thereby keeping the fire under control, and finally extinguishing the flames, which prevented a total loss of the ship, so far as the same could be destroyed by fire. The shipyard's superintendent, who called upon the three tugs to render the services in question, states that to them is due the credit for extinguishing the fire on the ship, and it seems to the court that what he says, under these circumstances, is entitled to special consideration. He was in control of the shipyard docks, and charged with the duty of protecting the property under his care; and his testimony as to what he did, and what was done by those aiding in the work in hand, and what he says of the occurrences which then took place, is entitled to much more weight than the statements of the average person, whether engaged actively in fighting the fire or as a mere looker-on.

We have only to determine the amount the libelant and petitioners should receive for their services as salvors; no claim having been made in these proceedings by the owners of the tugs, the members of the city fire department, or the city itself, assuming the two last named could prefer such claim. In making the allowance, the court should be controlled by the usual rules governing salvage awards, which are not based upon a mere compensation for work done and labor performed, but upon public considerations affecting the interests of commerce, the advancement and safety of navigation, and the security of life and protection of property by those engaged in a hazardous service. In arriving at a proper award, the courts especially take into account the risks involved to the salvors, the enterprise, labor, and skill displayed, the value of the property salved, the extent of the danger from which it was saved, and also the value of the property and apparatus used in the expedition. It cannot be said in this case that the actual risk to the salvors was very great, though there was considerable from falling wires and timbers. During the fire one man was killed, and four fell overboard, two of them being of the salvors. The suffering from the weather was considerable. The service lasted from about 4:30 in the evening until about

8:30. The weather was freezing, the wind blowing hard, and the men constantly wet. One of the petitioners, Capt. Roper, of the tug Alice, from the exposure incident to the service, contracted rheumatism, and was confined to a hospital some four months. Great enterprise and skill was displayed, and arduous labor performed by the salvors in their service; in fact, Capt. Roper, of the tug Alice, which played the largest part in the service, and who gave general direction to the work of the tugs, had had large and varied experience in extinguishing fires, which, in the opinion of the court, counted for much in knowing what to do in the emergency in which he was placed.

The value of the Jefferson is believed to be about $300,000, and, assuming that all the materials capable of burning should have been destroyed—that is, supposing that the hull and machinery were not seriously affected by the fire—it would have cost $140,000 to have rebuilt her; and to have replaced merely the superstructure, joiner work, etc., on the ship, with the possible damage to the hull, would have cost from $75,000 to $80,000. The values of the tugs were placed as follows: The Alice, at $15,000 to $20,000; the Helen, $12,-000 to $15,000; and the James Smith, Jr., at about $7,000 to $8,000. The amount that should be allowed the libelant and petitioners for their services rendered jointly in connection with the fire is $6,000, which the court is advised by counsel representing them all can be awarded in a lump sum. If this agreement cannot be had, the court will then properly apportion the amount among the masters and crews of the several tugboats, in proportion to the services believed to have been rendered by each of them.