## THE MARYLAND.

### (District Court, E. D. Virginia. July 25, 1911.)

SALVAGE (§ 31*)—AMOUNT OF COMPENSATION—FIRE.

An award of $19,250 in the aggregate made to the owners, officers, and crews of five tugs and a steamer for salvage services rendered in saving the steamship Maryland and her cargo which had caught fire after leaving Norfolk for New York, and had put in at the Deepwater Pier at the Jamestown Exposition at Sewells Point and landed her passengers; the value of the Maryland and cargo being about $228,000 and of the salving vessels over $100,000, and the services very efficient and rendered at considerable peril to those engaged.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 75–77; Dec. Dig. § 31.*

Awards in federal courts, see note to The Lamington, 30 C. C. A. 280.]

In Admiralty. Suit by the Chesapeake & Ohio Railway Company and others against the steamer Maryland for salvage services. Decree for libelants.

This is a case under the consolidated title of Chesapeake & Ohio Railway Co. against the steamship "Maryland," instituted through five certain libels and petitions filed by the masters and crews for themselves and the owners of their vessels, the steam tugs Baxter, McCaulley, Eccles, Helen and Wanderer, and the steamer Endeavor, to recover salvage for services rendered in extinguishing a fire upon the steamer Maryland, and her cargo, which occurred on the evening of the 15th of December, 1910, as she was proceeding on her outward trip from Norfolk to Cape Charles, Virginia, said services having been rendered at the Deepwater Pier of the Jamestown Exposition, Sewells Point, Va., to which the Maryland, while on fire, had made fast with a view primarily of landing her passengers, which she did. The fire was a serious one; the steamer succeeded in discharging her passengers, and the ship and most of the cargo was saved, though with great damage and loss to both. Valuable services were undoubtedly rendered by the salvors, whose aggregate claims amount to $146,000. The approximate value of the Maryland is $200,000, and of her cargo $27,801.42. After taking testimony and hearing arguments of proctors, the court filed a brief memorandum, as follows: "The conclusion reached by the court in this case is: That an award should be made, as against the steamer Maryland and her cargo of cotton libeled, of $19,250, to be apportioned as between the two at $17,750 against the steamer and $1,500 against the cotton, and that, as between the libels filed by the respective steamers and tugs, they should recover as follows: The steam tug Baxter and her master and crew, $5,250; the steamer Endeavor and her master and crew, $4,000; the steam tug McCaulley and her master and crew, $3,500; the steam tug Eccles and her master and crew, $3,250; the steam tug Helen and her master and crew, $2,250; and the steam tug Wanderer and her master and crew, $1,000. That the four vessels first named should have judgment against the Maryland alone, and the last two vessels, namely, the Helen and Wanderer (each owned by the Chesapeake & Ohio Railway Company, should have a joint judgment for $1,750 against the Maryland and $1,500 against the cargo of cotton. The conclusion further reached by the court under the facts and circumstances of this case is that, as between the several vessels libeled and their masters and crews, the recoveries herein allowed should be apportioned, one-half to the owners of the vessels, and one-half to the masters and crews, respectively, the same to be paid to the master and crew in proportion to the wages earned by each, except that in the case of the Endeavor, a passenger steamer of considerably greater value than the tugs, as to them the apportionment should be two-thirds to the owners of the Endeavor and one-third to the master and crew,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

190 F.—41

to be distributed among them in accordance with the salaries received by them as above indicated"—intending to elaborate its views later.

Hughes & Little, for Chesapeake & Ohio Railway Co.
Thorp & Thorp, for tug H. A. Baxter.
Henry Bowden, for tug McCaulley.
William Leigh Williams, for steamer Endeavor.
John W. Oast, Jr., for tug Samuel Eccles, Jr.
Thomas H. Willcox and Floyd Hughes, for the Maryland.

WADDILL, District Judge (after stating the facts as above). In this case there is no denial by the respondent that the services sued for were rendered, and were efficient, timely performed, and most valuable in character; and the controversy is solely over the amount to be allowed the salvors therefor. No general discussion of the principles controlling salvage awards in fire cases need be entered into, as they are well and definitely understood. The Jefferson (D. C.) 181 Fed. 416. The court will therefore content itself with stating the special considerations that led it to allow the sums awarded.

First. The Maryland is a large first-class passenger and freight steamer on the line between New York and Norfolk, Va., via Cape Charles, and built to withstand the storms incident to crossing the waters of lower Chesapeake Bay. She was crowded with passengers at the time, having on board 107, and well loaded with freight on the lower and main decks, in addition to express and United States mail matter. The fire broke out about 6:40 on the evening of the 15th of December, 1910, shortly before the steamer reached the Virginian Railway piers at Sewells Point, and was at once found to be of grave character. The ship was at the earliest moment after discovery of the fire, headed for the Deepwater Pier of the Jamestown Exposition at Sewells Point, to which she was made fast, and every possible effort exercised by her master and crew to avert the impending disaster. Fire signals were promptly given, to which all of the neighboring shipping responded, and telephone communication was had looking for assistance from Newport News and Port Norfolk. The libelants, as well as other vessels in the neighborhood, appeared quickly on the scene, but to the former alone, save what assistance the Maryland herself rendered, is due the credit for extinguishing the fire and saving the ship, though one of the tugs of the respondent company likewise rendered some assistance. The passengers were all landed on the piers, and it seems without special injury to them, and, after some hours, were transferred to another steamer of the same line. The fire which for a while could not be subdued was finally gotten under control in perhaps an hour and a half; and by 11 o'clock at night was apparently entirely extinguished. The mail and express matter appears to have been saved without particular loss, though the cargo was seriously damaged, and some of it totally destroyed. The services rendered by the salvors were valuable, and performed in a highly intelligent and satisfactory manner at considerable risk at times to members of the salvors personally. Indeed, the court thinks the extinguishment of the fire was due largely to the manner in which the work in hand was

performed; the officers and crew of the Maryland likewise doing all in their power to the same end. The spirit displayed in the effort to save the burning ship on the part of all engaged in the service was highly commendable, and, indeed, it was only by the prompt and efficient action of this large number of intelligent seamen that the saving of this ship was possible, and particularly with such small damage to her.

Second. In the view taken by the court of the testimony, great success attended the service, as the steamer was in undoubted danger of total destruction, which condition was accentuated by reason of the strong wind from the west northwest, having regard to the place of anchorage of the vessel, which made her position at the Deepwater pier an exceedingly exposed one, immediately within the sweep of the wind down James river, across the upper waters of Hampton Roads and Chesapeake Bay to the Capes. The subjection of the fire under the circumstances was not only exceedingly difficult, but it is doubtful whether it could have been accomplished at all, had the fire been on the port, instead of the starboard side of the steamship.

Third. The vessels engaged in the salvage services were of great value, largely in excess of $100,000 in the aggregate. The Endeavor was a passenger steamer of large size, used as a ferryboat plying between Newport News and Sewells Point, a distance of some six miles. The tugs, with the exception of the Eccles, were all large and powerful, the Helen and Wanderer especially fitted with extra large pumps and fire apparatus, used for fighting fire in the harbors of Newport News and Norfolk, and the officers and crews of the ferryboat and tugs were men of considerable experience in extinguishing fires by means of tugboats; one or more of them being experts in that line, which greatly added to the character and efficiency of the services performed. They one and all abandoned the services they were respectively engaged in at the time the fire signals were given, and gave unremitting attention to the work of saving the Maryland, as long as they could be of service, some of the boats being detained much longer than others, the longest from the beginning of the fire until about 11:30 at night.

Fourth. At the trial, the respondent strongly urged that the award should be controlled by the fact that the Maryland could have landed her passengers, backed out into deeper water in the channel, opened her sea-cocks, and scuttled herself; and in that event certainly her hull would have been saved, and her machinery not seriously injured. This defense is apparently an afterthought, certainly nothing of the sort was contemplated at the time of the fire, and in the opinion of the court it would, under the circumstances, have been impossible, and indeed reckless to have attempted such a thing; and it by no means follows, taking into account the damage to and almost certain loss of mail and express matter, passengers' baggage and freight, that it would have been at all a practicable thing from an expense standpoint to have done. The navigators of the Maryland made no such attempt; on the contrary, they adopted an entirely different course, and one in which they sought most urgently for and accepted assis-

tance. In fact,·they·adopted the only course that their experience and wisdom indicated to them was proper. They displayed great coolness, courage, and sagacity in all they did, and in no other way could they have saved the steamer.

Fifth. The court will not attempt to go into details of the reasons which impelled it to make the apportionment of the award between the several salving vessels, as there is no exception in that respect among them, further than to say that they will fully appear by a careful examination of the testimony, and the circumstances under which they severally performed the work in hand. An illustration for instance of one of the cases is that of the Eccles, a small tugboat, which by reason of her light draft, could pass around the steamer into shoal water, and fight the fire from her starboardside, a position of great advantage, though of much danger to the Eccles.

Sixth. In the division of the award between the libelant vessels and crews, there is likewise no dispute. The court believes, having regard to the services rendered, and taking into account the value of the several vessels, and the character of the services performed by the seamen, that the division is a proper one as made (Cape Fear Towing & Transportation Co. v. Pearsall, 90 Fed. 435, 33 C. C. A. 161), and within the ruling of the Circuit Court of Appeals for this circuit in the comprehensive opinion of Judge Simonton in that case.