J. M. GUFFEY PETROLEUM CO. v. BORISON et al. SAME v. REED et al. (RUMMLER, Intervener). SAME v. REED et al.

(Circuit Court of Appeals, Fifth Circuit. February 3, 1914.)

No. 2430.

1. SALVAGE (§ 24*)—PURPOSE OF REMUNERATION.
    Salvage awards should be liberal to encourage prompt, energetic, and daring service in the relief of vessels in peril, but should not be extravagant, and such as to excite greed and promote unreasonable pretensions.
    [Ed. Note.—For other cases, see Salvage, Cent. Dig. § 55; Dec. Dig. § 24.*]

2. SALVAGE (§ 38*)—AMOUNT OF COMPENSATION.
    That one set of salvors do not prosecute their claims inures to the benefit of the vessel, and not to that of other salvors, who do prosecute their claims.
    [Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 93–102; Dec. Dig. § 38.*]

3. SALVAGE (§ 27*)—AMOUNT OF COMPENSATION—NATURE OF SERVICE.
    Salvage services rendered to steel vessels, or in a port where help is plentiful, are not in general entitled to as large compensation as was formerly awarded in case of wooden ships, and where the services were rendered on the high seas where help was scarce.
    [Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 65, 66; Dec. Dig. § 27.*]

4. SALVAGE (§ 27*)—AMOUNT OF COMPENSATION—RESCUE OF OIL TANK VESSEL FROM DANGER OF FIRE.
    The steel oil tank barge Shenango, with a cargo of oil in her tanks, was anchored near a wharf in the harbor of Port Arthur, Tex., when another tank vessel exploded, throwing burning oil for some distance, setting fire to a wharf and oil warehouse near the Shenango and also to parts of the superstructure of the barge itself. The tug Captain Sam, which was the property of the owner of the barge, and equipped with fire-fighting apparatus, went to her assistance, and with the help of a fireman and two longshoremen who volunteered and put out the fire, and then, having freed her anchor, with the assistance of libelant's tug Viva, towed the barge to a place of safety. The barge and cargo were worth $180,000, and the tug Viva not to exceed $7,000. The greater part of the service was rendered by the Captain Sam and her crew. These and the individual salvors were exposed to serious danger, but the Viva, which was made fast to the bow of the Sam by a line and was ahead in the towing, was

not. *Held*, that an award of about $2,400 to the Viva and her crew, and of $250 each to the volunteer assistants, was as much as was justified.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 65, 66; Dec. Dig. § 27.*

Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.]

Appeals from the District Court of the United States for the Eastern District of Texas; Gordon Russell, Judge.

Suits in admiralty by Simon Borison and others and by T. S. Reed, trustee, owner of the tug Viva, and others, in which A. Rummler, intervened, against the barge Shenango, and by said Reed and others in personam against the J. M. Guffey Petroleum Company and another. Decree for libelants, and respondents appeal. Reversed.

D. Edward Greer, of Beaumont, Tex., Robinson Leech, of New York City, and W. B. Spencer and Chas. Payne Fenner, both of New Orleans, La., for appellants.

Stuart R. Smith and C. A. Lord, both of Beaumont, Tex., for appellees.

Before PARDEE and SHELBY, Circuit Judges, and GRUBB, District Judge.

PARDEE, Circuit Judge. These are appeals by the owners of the barge Shenango and cargo from three decrees of the District Court awarding salvage for services rendered to the barge and cargo by the tug Viva and three men, Borison, McCann, and Rummler, during a fire at Port Arthur, Tex., June 26, 1911. They were tried and decided together, and have been consolidated for the purposes of this appeal, and have been here heard together.

The salient facts are stated in the findings of fact by the District Judge, which we find in the main, and as far as they go, to be in accordance with the evidence, to wit:

"The above cases were by agreement of counsel tried together, and the evidence introduced by the parties was considered in each case, and therefore I embrace the findings relative to each case in one statement.

"The cases grew out of the salvage of the barge Shenango and its cargo, which were imperiled by a fire in the harbor at Port Arthur, Tex., on the 25th day of June, 1911.

"The first two cases named above were actions in rem against the barge, and the last case is an action in personam against the J. M. Guffey Petroleum Company and the Gulf Refining Company, alleged to be owners of the said cargo. The first case, No. 98, is a libel by Simon Borison and B. F. McCann for salvage services rendered by them to said barge. The second case, No. 99 is a libel by T. S. Reed, trustee, owner of the tug Viva, and of H. M. Fredericksen, its master and its crew against said barge, in which case the individual libelant, A. Rummler, intervened, asking also for salvage for assisting in the rescue of said barge. The last case mentioned above, No. 101, is an action in personam by all of the libelants in the said actions numbered 98 and 99 against the J. M. Guffey Petroleum Company and the Gulf Refining Company as owners of the cargo, to recover the salvage in rescuing said cargo, the allegations being that before the vessel and cargo could be seized under libel, the vessel had left port and discharged its cargo beyond the jurisdiction of this court, and therefore the suit in personam was brought against the owners of the cargo.

"Findings of Fact.

"Between 6:30 and 7 o'clock on the morning of the 26th day of June, 1911, the barge Humble, in the turning basin of the harbor at Port Arthur, Tex., from some unexplained cause, exploded, and being laden with a cargo of oil in bulk, the oil was ignited and scattered over the surface of the water and on the sides and decks of nearby vessels. The barge Shenango had just received its cargo of oil, consisting of bulk oil as follows: 1,858 barrels of radium, 5,386 barrels of P. E. Naptha, 6,934 barrels of gasoline, 547 barrels of lusterlite, 12,874 barrels of fuel oil.

"The barge was constructed of steel. and was what is known as a tank barge. It is divided into compartments, the compartments numbering 16 in all, and occupying the entire vessel, except for about 40 feet at the bow, and when the vessel was loaded the oil on the sides was under the deck, and the top of the oil was from 2 to 4 feet below the water line. Along the center of the barge, running longitudinally, was a raised structure, about 10 or 12 feet in width, and running the entire length of the oil tanks and communicating with them. This was called the expansion deck. When the barge is loaded, the oil comes up in this expansion deck within a few inches of the top of the same, this small space being left to allow room for the expansion of the oil under varying temperatures, and for the escape of gas. Each compartment communicates separately with this expansion deck, and over each compartment in this expansion deck are fitted valves which, under heavy pressure, will open sufficiently to allow gas to escape.

"The fire thus started by the explosion of the barge Humble rapidly enveloped the wharves, and set fire to the Texas Company's warehouses and storage rooms located along by the side of the Texas Company wharf, and within a short distance of the Shenango, which was tied up to the Guffey Company's wharf near the Texas Company's. The warehouse contained vast quantities of case oils, naptha, gasoline, and kerosene and other petroleum products, which, on taking fire, began to explode; and, in the course of the fire, which continued for several hours, probably about 145,000 cases of these oil products exploded, large quantities of their contents running into the turning basin; and, until the Shenango was removed from without the fire zone by the tugs Captain Sam and Viva, as hereinafter stated, she and her cargo were in great danger of destruction.

"Shortly after the fire broke out, the longshoremen, Borison and McCann, ran a line, by the use of a skiff, from the stern of the Shenango, which had swung somewhat away from the burning wharf across the turning basin, and made it fast to the shore, with the design and intent of preventing the stern of the barge from swinging back to the wharf. Having done this, they went immediately back to the Shenango, where the intervener, Rummler, had been from the time the Captain Sam reached the Shenango, and joined him and the crew of the Captain Sam and other employés and agents of the J. M. Guffey Petroleum Company and of the Gulf Refining Company in putting out the fire which had started on the fore part of the Shenango in her superstructure. These parties, Borison and McCann, took buckets and dipped water from the basin and poured it on the smoldering fires. At one time a loose burning craft in the basin floated very near to the Shenango, and Borison and McCann, one or both, threw water on it and pushed it away with their feet from the sides of the Shenango. The intervener, Rummler, reached the Shenango before Borison and McCann did, and immediately began rendering assistance in putting out the fire and trying to save the barge and cargo. Very soon after the explosion of the barge Humble, and the beginning of the fire, the steamtug Captain Sam, the property of the J. M. Guffey Petroleum Company, which was an ocean-going and powerful tug, specially equipped to fight fire, with steam pump and full equipment of hose, arrived on the scene, and, going up to the Shenango, put a line on her deck and and attempted to pull her out from the burning docks, stern foremost. It was then found that on account of the anchor of the Shenango being down, and, as subsequently ascertained, tangled or caught in some submerged cable, the Sam could not pull out the Shenango. The Sam then went alongside the Shenango, and commenced playing three streams of water from her steam pumps and hose on the fire which had

started in the superstructure of the Shenango in the fore part of the vessel near her bow; and, in a short time, about 20 minutes, succeeded in putting out the fire, except for the smoldering sails and pieces of loose timber lying on the deck. As before stated, libelants, Borison and McCann, did what they could in assisting by dipping water from the basin in buckets and pouring it on the smoldering fire.

"When the fire was practically put out, the crew of the Sam and other employés of the J. M. Guffey Petroleum Company and the Gulf Refining Company tried to raise the anchor of the Shenango; but, as there was no steam on the Shenango to work the winch, they found they were unable to do it. They then tried to turn the drum of the winch so as to pay out the anchor chain in order that they might get to a joint or clevis-like connection in the chain, which are placed about every 15 fathoms, or every 90 feet, in the chain. They found they were unable to turn the drum of the winch at all, and Rummler, Borison, and McCann tried to do so, but failed. Capt. Bliss, of the J. M. Guffey Petroleum Company, then sent for the chief engineer of the Captain Sam, Mr. Roper, and he came on and released the drum of the anchor winch, so that the chain could be paid out, and so that they could arrive at the severable joints. When this was done they all went to work to part the anchor chain. The testimony is conflicting as to just who performed this service of separating the anchor chain. Borison and McCann attempted to cut the chain, but were unable to do so. Finally the pin which holds the clevis in the anchor chain was removed and the chain parted, and the Captain Sam, having already had on the bow, as stated, its line, with the assistance of the tug Viva, as hereinafter stated, easily towed the Shenango away from the fire and out of danger. During this time, which occupied about 45 minutes, the Sam had put her line on the bow of the Shenango and commenced to pull with the intent to tow her out.

"Shortly after the fire broke out, and the Captain Sam went to the rescue of the Shenango, Davis and Lawless, two of the employés of the Gulf Refining Company and the J. M. Guffey Petroleum Company, went in a launch to where the tug Viva was moored, some 1,200 feet down the basin, and some 1,200 or 1,400 feet away from the fire, and made a contract with Capt. Frederickson, the master of the tug Viva, to go up and give assistance in the hauling or pulling out of the Shenango. According to some of the witnesses the amount to be paid for this service was $100, and according to others it was $500, but the witnesses agree that there was a contract made with Fredericksen, the captain and master of the Viva, to the effect that he would go up and put a line on the bow of the Sam and give a pull to assist her in pulling out the Shenango. When Lawless made the offer to Fredericksen to put a line on the Sam and assist her in pulling out the Shenango, neither Lawless nor Fredericksen knew that the anchor of the Shenango was down and fastened, but the offer was made by Lawless and accepted by Fredericksen under the belief that such was not the condition of the anchor of the Shenango. Immediately after this agreement was made, the tug Viva, in charge of the said Capt. Fredericksen, came up close to where the Sam was alongside the Shenango putting out the fire. According to the preponderance of the testimony Capt. Bliss, who was the marine agent of the J. M. Guffey Petroleum Company, and who was the man in charge in trying to put out the fire and rescue the Shenango, hailed Fredericksen, Bliss not knowing of the contract made by Lawless with Fredericksen, and asked him what he was going to do. Fredericksen replied that he had agreed to go up and give a pull on the Shenango by putting a line on the Sam. Bliss replied that that was all right, but he could not do anything at that time, because the anchor was down, and nothing could be done until the anchor was slipped or the anchor chain cut, except to stand by and wait for a signal. Fredericksen then took the tug Viva back to her former mooring place, and again tied up. A few minutes after this had occurred, the fire having been practically put out on the Shenango, the Captain Sam having put her line on the bow of the Shenango and was pulling on the line, Fredericksen with the Viva came back near the point, with the view of getting around the Shenango and pulling out the barge Dallas, which was also on fire in the same vicinity. When he came back there he put a line on the Sam, and the two

together, that is the Viva and the Sam, began pulling on the Shenango, even before the anchor chain was separated, and succeeded in dragging the anchor a little and thus in moving the vessel perhaps 100 feet. During all this time the parties on the Shenango, including Rummler, Borison, and McCann, were working on the Shenango and endeavoring to part the anchor chain. As before stated, after about 30 or 40 minutes' work they succeeded in doing this, and then the two tugs easily and quickly pulled the Shenango out of danger. The line of the Captain Sam on the bow of the Shenango was about 50 feet long, and the Captain Sam was about 185 feet long; the line which the Viva had on the bow of the Sam was variously stated at from 50 to 100 feet, so that the Viva, when she was pulling with a line on the Sam, was in the neighborhood of 300 feet from the Shenango.

"I find that the work of Borison and McCann, and of Rummler, was valuable, voluntary, and rendered under circumstances requiring great courage.

"I further find that when Fredericksen made his bargain with Lawless and Davis to go up and give a pull on the Sam, he did not know that the anchor of the barge Shenango was down, and that his agreement was made while none of the parties thought that said anchor was down and fastened.

"While the testimony did not show the value of the tug Captain Sam, it did show that she was much larger and a more powerful tug than the Viva, and that she was equipped with fire-fighting devices, and had a larger crew. And I find that the services of the Sam and of her crew were equally as hazardous and dangerous, and required as much courage as that of the crew of the Viva.

"I further find that after the anchor chain was parted the Captain Sam could easily herself, with the assistance of the Viva, have taken the Shenango quickly out of the burning docks, and out of danger. Either vessel, the Sam or the Viva, could have readily taken the Shenango out had the anchor of the Shenango not been down. Still I find that the Viva did render substantial assistance, and performed valuable salvage service.

"This preliminary statement is made, not for the purpose of stating all of the material facts, but with the view of making clear the general nature of the case.

"My specific findings are:

"(1) The barge Shenango and cargo was in a situation of imminent danger of destruction for a period of at least 2½ hours.

"(2) That Borison, McCann and Rummler were exposed to peril of their lives during the said time, and that their services were valuable in facilitating and hastening the rescue of said vessel.

"(3) That the tug Captain Sam was a tug of greater size and power than the tug Viva, and manned by a larger crew, but the value of said tug is not shown, and the same appears from the evidence to be of considerable age. This tug and its officers and crew rendered service of greater value than the tug Viva and its crew; and I find that several individuals in the employ of the Gulf Refining Company rendered services of equal value as the services rendered by the said Borison, McCann, and Rummler, in putting out fires and in releasing the anchor of the Shenango.

"(4) That the tug Viva is a tug of about 140 horse power, and its assistance in towing the barge Shenango was necessary in moving said Shenango up to the point when the anchor was released, when the tug Captain Sam could have thenceforward towed said barge Shenango without assistance.

"(5) That the time occupied by the tug Viva in assisting in the towing of said barge Shenango to a place of safety, was 1 hour and 20 minutes, 1 hour of which was consumed before the anchor was released, and during which time said tug and its crew were exposed to great peril.

"(6) That a contract was made between Fredericksen, the master of the Viva, and Lawless, by which Fredericksen agreed to assist in towing the barge Shenango for the sum of either $100, or $500, but at the time such contract was made, neither Fredericksen nor Lawless knew that the anchor of the Shenango was down and fastened. The offer was made by Lawless, and accepted by Fredericksen, upon the idea that this condition did not exist. Fredericksen learned for the first time when he approachd with the Viva to pull on the Sam what the condition of the anchor of the Shenango was, and

he was then informed by those in charge of the Shenango that he could do no good at that time, and he returned with the Viva to where she had been moored. When he returned the second time to the Sam and was requested to pull on her, the conditions had materially changed. The peril to the Viva and her crew was greater. The fact that the anchor was down required a different effort on the part of the tug Viva, than was supposed to be necessary when the contract was made, and, to make the pull at this second time she approached the Sam, entailed a longer continuance of peril than would have been the case if the conditions had existed as they were supposed to exist at the time the contract was made.

"When Fredericksen went back the second time it was for the purpose of getting out the barge Dallas, and he was then requested to pull on the Sam. He complied with this request, as herein stated, but, in so doing, he was not intending to comply with the contract aforesaid made with Lawless.

"(7) I also find that when Fredericksen returned the second time to the scene of the fire, he intended to undertake the rescue of the barge Dallas, which was a large barge laden with oil, and which he could have rescued alone under conditions entitling him and his crew to salvage, had he not been called to the assistance of the tug Captain Sam, and had he not responded to such call, and, instead of his tug rescuing the barge Dallas alone, the tug Captain Sam was enabled to join with the Viva in rescuing the barge Dallas.

"(8) I find that neither the crew or the owner of the tug Viva were apprised of any arrangement between the master, Fredericksen, and those acting for the Shenango looking to the assistance of the tug Captain Sam in towing out the Shenango.

"(9) I find that no contract existed between the owners or those in charge of the Shenango and the salvors, Borison and McCann, relative to the services rendered to them by said barge.

"(10) I find that the tug Viva was owned by and in the private service of T. S. Reed, as trustee, and was being used in transporting shell, sand, etc., and that its master, H. M. Fredericksen, had no authority to make any character of contracts on behalf of the tug or its owner.

"(11) It was agreed on the trial between the parties, and I so find, that the value of the barge Shenango is $136,000, and that the value of the cargo saved was $45,764."

Supplementing these findings of fact, we find from the evidence that the tug boat Viva was an old boat in 1902, at which time it was purchased by Myrick & Co., for $1,600; since that time it has been repaired and rebuilt as to hull, and machinery except the engines, three times, the last time in 1909. The Viva was sold under orders of court to its present owners before the Shenango fire, and its value is not shown. Estimates were given varying from $4,000 to $10,000, but the best evidence was not produced. From its history and the evidence furnished the value could hardly exceed $7,000. It was only equipped for the towing business, and was not equipped for rendering salvage services with adequate pumps, hose, hawsers, experienced crew, and generally necessary appliances.

The Viva went to the aid of the Shenango after the fire thereon was subdued, if not entirely extinguished, and then did not go nearer than the outside and astern of the Captain Sam, say 300 feet, until after the Shenango was pulled away from the wharf. Outside and astern of the Captain Sam she had a line of 50 to 75 feet to the Captain Sam upon which she pulled, thus aiding the Captain Sam in its work of pulling the Shenango away from the wharf; and, after the Shenango was cleared from the wharf, the Viva assisted the Captain Sam in towing the Shenango a short distance to a place of safety.

In rendering these services the Viva was in no actual peril, except

the possibility of injury in case the Shenango should (notwithstanding. the fire was practically out) blow up, scattering fire over 300 feet.

Rummler, a fireman in the employ of the Port Arthur Waterworks, was carried on board the Captain Sam by Bliss, the marine agent of the Guffey Petroleum Company, who mistook him for an employé of that company, and from the Sam, Rummler went aboard the Shenango with the officers and crew of the Sam, and with them rendered service looking to the extinction of the fire. His wages per diem were not proved.

Borison and McCann were longshoremen employed in and about the port, whose wages, when employed, were from $4.50 to $7 per day. McCann was at the dock and had a skiff, and he was employed by Coleman, labor foreman of the Gulf Refining Company, to carry him to the Sam, and Borison seems to have gone along, and both rendered services on the invitation of Coleman.

Some 18 men, members of the crew of the Sam and employés of the Gulf Refining Company, rendered services to the Shenango, some of equal and some of more value than the services rendered by Borison, McCann, and Rummler.

The whole case shows that the Captain Sam rendered the really skillful persistent services to save the Shenango and its cargo, and through its success in that regard made a salvage case within the jurisdiction of the court, and thereto the services of the Viva and of Rummler, Borison and McCann and others were incidental and subsidiary.

The court below found the following conclusions of law:

"I find that the character of services rendered by the salvors was that of salvage service, and that 4 per cent. of the value of the barge and cargo is a proper amount to be awarded to the owner of the tug Viva and to its master and crew, to be apportioned, two-thirds to the owner, T. S. Reed, trustee, and one-third to the master, Fredericksen, and the crew of said tug Viva, to be apportioned among the said master and crew according to the amount of wages received by each of them at the time of the service, the said barge to pay according to its value, and the Gulf Refining Company to pay the balance of such award, and I find that the proper amount to be awarded to each of the salvors, Borison, McCann, and Rummler, is $750, to be apportioned between the barge and the owners of the cargo according to the value of each, the barge and cargo."

And judgment was accordingly rendered, thus awarding to the laborers Rummler, McCann and Borison, as volunteer salvors, more than 100 times their ordinary day wages, and to the Viva and its crew the sum of $7,276.50, an amount more than the probable value of the Viva.

The appellants contend that these allowances are excessive and out of all proportion to the incidental and auxiliary services rendered by the appellees, and are on the wrong theory that the appellees were original salvors in the matter, regardless of the greatly superior services rendered by the Captain Sam and the numerous employés of the oil and refining companies, and as to the Viva that its master and owners are bound by the alleged contract for services made with the agents of the appellants, and its compensation should be limited to the contract price, $100, or at most $500; and, as to Borison, McCann, and

Rummler, that their award should be on the basis of work and labor, and reduced to a reasonable amount, not exceeding $500 for all three.

As to the contract with the Viva, we are disposed to concur with the District Judge in ignoring the same, for the reason the contract claimed is not sufficiently proved as a binding contract; in fact Lawless is not shown to have had authority to make the same, either for the owners of the barge Shenango or for the refining company owner of the cargo; the evidence as to the terms of the contract is confused and conflicting, and, as to the price contracted to be paid the Viva, the same was not fixed and certain, and there was not a meeting of minds of the alleged contracting parties, fixing with certainty the main element of a contract to render salvage services, to wit, the price to be paid.

[1] As to the amounts of the allowances, we are satisfied that under all the facts and circumstances of the case, and in the light of admiralty rules and principles relating to salvage services, they are much too large, and should be reduced. If awards should be made on the same basis to all the parties who rendered services in saving the Shenango and cargo and to the Captain Sam and crew, which unquestionably rendered the bulk of the services, the amount would tend towards confiscation.

In admiralty courts victims of marine disasters, fire, wreck, or other calamity are compelled, under the guise of salvage awards, to pay for services rendered in escaping the danger, not on the principle of a quantum meruit or remuneration pro opere et labore, but as a reward for perilous services voluntarily rendered, and as an inducement to mariners in such dangerous enterprise to save life and property. See The Blackwall, 10 Wall. 1–14, 19 L. Ed. 870.

In The Sonderburg v. Towboat Co.. 3 Woods, 146, Fed. Cas. No. 13,175, Mr. Justice Bradley defines salvage as follows:

"Salvage is a reward for meritorious services in saving property in peril on navigable waters, which might otherwise be destroyed, and is allowed as an encouragement to persons engaged in business on such waters, and others, to bestow their utmost endeavors to save vessels and cargoes in peril."

The same eminent jurist in Murphy v. The Ship Suliote (C. C.) 5 Fed. 99, 102, said with regard to salvage:

"Salvage should be regarded in the light of compensation and reward, and not in the light of prize. The latter is more like a gift of fortune conferred without regard to the loss or sufferings of the owner, who is a public enemy, whilst salvage is the reward granted for saving the property of the unfortunate, and should not exceed what is necessary to insure the most prompt, energetic, and daring effort of those who have it in their power to furnish aid and succor. Anything beyond that would be foreign to the principles and purposes of salvage; anything short of it would not secure its objects. The courts should be liberal, but not extravagant; otherwise that which is intended as an encouragement to rescue property from destruction may become a temptation to subject it to peril."

In The J. Emory Owen (D. C.) 128 Fed. 996, Judge Seaman well says:

"While the value of the property saved enters into determination of the value of the salvage service, as an essential element, and the maritime law intends encouragement of gallantry and adventure in the relief of distressed

vessels, it is not the policy of that law to grant awards which tend to excite greed or promote unreasonable pretensions on the part of salvors, nor to disregard in any measure the interests of the owner of the rescued property."

[2] Nonprosecution of their claim by one set of salvors inures to the benefit of the owners of the vessel, and not to that of other salvors who do prosecute their claim.   The Blackwall, supra.

[3] Since the advent of iron and steel vessels operated by steam there has been a decided tendency by the courts to qualify the grades of salvage services, and to reduce the amounts of awards to salvors from the standard of former days of wooden sailing vessels, when generally the salvage services were rendered on the real high seas, and on sparsely settled shores, where help was scarce and assistance, when rendered, was at a sacrifice of time, and more or less risk to person and property.

This tendency to modify is shown in The Blackwall and The Suliote, supra, where, as in the instant case, the services were rendered at wharves in thickly settled ports where mechanical and other help were not only plentiful, but were ready and prepared to render services, and large rewards at the expense of suffering owners were not necessary to encourage assistance to vessels in distress.   See The New York (D. C.) 34 Fed. 922;  The Holland (D. C.) 44 Fed. 362;  The Kaaterskill (D. C.) 48 Fed. 701;  The Boyne (D. C.) 98 Fed. 444;  The Kaiser Wilhelm Der Grosse (D. C.) 106 Fed. 963;  The Priscilla (D. C.) 153 Fed. 476;  The Indian, 159 Fed. 20, 86 C. C. A. 210;  The Jefferson (D. C.) 181 Fed. 416;  The Maryland (D. C.) 190 Fed. 641.

[4] Viewed in the light of all the circumstances exhibited in this record, our conclusion is that one-third of the allowances made by the District Court will be large and liberal compensation to the appellee salvors now in court for salvage services rendered the Shenango and cargo.   This will give to Rummler, Borison, and McCann $250 each for a few hours' individual services, and to the tug Viva and its crew $2,423.18 for about two hours' services in the line of the Viva's regular employment.   We think this amount of award fully meets all possible purposes contemplated by the law, and that a larger amount would be unwarranted judicial liberality.   Unless the appellees are to be rewarded beyond their own merit and because of the misfortune of the owners of the Shenango and cargo, they can have no reason to complain.

The decrees of the District Court in all three causes are reversed, and the said causes are remanded, with instructions to enter decrees in favor of the libelants and intervener, respectively, in accordance with the views herein expressed, and for all costs of the District Court.