## THE MAGNOLIA.

(District Court, N. D. California, N. D.   September 10, 1918.)

### No. 16063.

1. SALVAGE ⬦48—CONTRACT—AGREEMENT.
   Where libelant, who rendered services in salvaging a wreck, claimed an award as a salvager, evidence *held* insufficient to sustain the defense that the services were rendered under a contract under which compensation should be on the quantum meruit.

2. SALVAGE ⬦4—SERVICES—WHAT CONSTITUTES.
   Where a launch rescued a vessel discovered floating, capsized, and bottom up, a short distance outside of a line of breakers off a bar, and the danger was considerable, *held*, that the service was a salvage service.

3. SALVAGE ⬦19—SERVICES—AWARD.
   Where a schooner capsized, and close to breakers was rescued and towed out to the open sea, the fact the master of the launch allowed a tug under contract with the owners of the schooner to continue the towage to a point of safety *held* not to make the tug and launch, which first rescued the schooner, cosalvagers, although the towage service might be considered in determining the value of the launch's service.

4. SALVAGE ⬦28—SERVICES—AWARD.
   Where a gasoline schooner, worth between $8,000 and $10,000, which had capsized and was floating a short distance outside of breakers off a bar, was rescued and taken in tow by power boat worth from $4,000 to $5,000, and the danger was considerable, etc., *held*, that $750 should be awarded for salvage services.

In Admiralty. Libel by William Crone against the gasoline schooner Magnolia. Decree for libelant.

Puter & Quinn, of Eureka, Cal., for libelant.
Coonan & Ricks, of Eureka, Cal., for claimant.

VAN FLEET, District Judge. This is a libel for the value of services rendered in salving a wreck. It grows out of these facts:

Early in the morning of the occasion in question, a vessel was discovered floating, capsized, and bottom up, a short distance outside the line of breakers off the bar at the mouth of the Klamath river, which flows into the Pacific on the coast of California about 48 miles north of Humboldt Bay. The sea was rough, and she appeared to be in great danger of going ashore. When first discovered, the identity of the vessel, by reason of her situation and submerged condition, could not be made out, but from her size and appearance it was thought to be the Magnolia, a gasoline schooner of 49 tons burden, which was known to ply between the port of Eureka and other ports along the northern coast. Word of the wreck was immediately brought to Requa, a fishing village situated on the Klamath a mile or so from

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

its mouth, where Capt. Crone, the libelant, was at the time lying at the wharf with the Coaster, a small power boat of some 14 tons burden, of which he was master; and upon being informed of the disaster he, in company with others, at once proceeded to a point overlooking the wreck at a distance of some half mile, the nearest she could be approached by land, and effort was made with a glass to ascertain her identity. While this could not be definitely determined, it was thought by the observers that there was some evidence of life aboard, and thereupon Capt. Crone immediately returned to Requa and prepared to make an effort to go out to the submerged craft, which by reason of the known dangerous character of the entrance, the condition of the tide, and the badly breaking bar, was regarded as exceedingly hazardous, if not impossible, at the time. His boat being loaded, he was required to first discharge cargo, or partially so, and secure an additional hawser and an extra man for his crew, all of which he did as expeditiously as possible, and then dropped down to the mouth of the river, where after several fruitless efforts, but watching his opportunity, he finally, in the neighborhood of 10 o'clock, by skillful maneuvering, succeeded, with great hazard to his craft and peril to her crew, in getting across the bar, when, by the aid of a skiff, he was able to get a line aboard the capsized boat. She proved to be the Magnolia, but no evidence of life was found aboard, and Capt. Crone proceeded to tow her off shore 3 or 4 miles to safety, and then headed south, with the intention to take her into Humboldt Bay. He had towed her some 8 or 10 miles on this course, when he was met by Capt. Coggeshall, one of her owners, who having, as hereafter appears, been informed of her plight, had procured a tug and life-saving crew and was proceeding to her rescue. After some parley, and a promise by Coggeshall that Crone should be compensated for his services, the latter surrendered her to the owner, and she was taken in tow by the tug and carried to Eureka, where she was subsequently righted and refitted. The time Crone was engaged in his work of rescue was from 8 to 10 hours. It is conceded that the value of the Magnolia, at the time she was rescued and taken in tow by the Coaster, was from $8,000 to $10,000, and that the value of the Coaster was from $4,000 to $5,000. In due course libelant presented a demand to the owners for compensation for his services, which not being honored, the libel ensued.

The defenses interposed are, in substance: (1) That the case is not one of strict salvage, but of contract service, wherein the basis of compensation is quantum meruit; (2) that, if a case of salvage, it is one of joint salvage, rendered by the Coaster and the tug, and that compensation must be apportioned and awarded accordingly.

[1] As to the first defense, it is based upon the claim that the rescue of the Magnolia was by agreement or understanding with the owners. The claim grows out of a telephonic conversation between Capt. Crone and Capt. Coggeshall on the morning of the wreck. On learning of the wreck, and that it was believed to be the Magnolia, Capt. Crone, who knew Capt. Coggeshall, called the latter on the telephone at Eureka and told him of the fact. He testified:

"I told Capt. Coggeshall that a boat was capsized outside the bar which appeared to be the Magnolia. He replied that it was not she,' as she was in Crescent City. Then he said, if it was the Magnolia, could any one go out and get her; and I answered that it was too rough to go out."

And he testified that he did not agree to go out to the wreck. Asked how he came to go out, he said:

"After the conversation over the phone I went up on the hill to take a look at the vessel; there was quite a crowd there looking at the wreck; some claimed they could see persons clinging to the bottom, and remarks were made that some one should go out. After watching the wreck for a while, and listening to the talk, I concluded to take a chance and go out. My idea in going out was, first to save life, if there was any on the wreck, and next to save the Magnolia. After taking in the situation, I really went out because, as a seaman, I thought it was my duty. I did not go because of any conversation with Capt. Coggeshall over the telephone."

Capt. Coggeshall, on the other hand, testified that Capt. Crone agreed to go out after the submerged vessel; that the substance of their conversation was that, when Crone told him of the wreck and that it was supposed to be the Magnolia, he said to Crone:

"I would like to arrange to have you go right to sea. Do you think you would be able to go to sea right away?
"Capt. Crone: There is a little too much sea right now, and not enough water.
"Capt. Coggeshall: I wish you would make ready to go to sea, and let me know if anything can be done. I want you to go out if you possibly can.
"Capt. Crone: It is reported that there are men on board of the Magnolia.
"Capt. Coggeshall: If you possibly can get out, I wish you would go and first try to save life, and if you can't do that make fast to the ship and do the best you can with her, and whatever is right for your time and trouble I will pay you.
"Capt. Crone: That is all right; I think I will be able to get out.
"Capt Coggeshall: Go as soon as you can."

There was no other testimony as to what occurred at this conversation, and it is sufficient to say that I am unable to find in accordance with the version given by Capt. Coggeshall, assuming that it would tend to establish a contract rather than a voluntary salvage. See The Roanoke, 214 Fed. 63, 65, 130 C. C. A. 503. I am of opinion that the other circumstances in the case, and particulaly what occurred between Capt. Crone and Capt. Coggeshall when the Magnolia was taken in tow by the latter, and the further fact that Coggeshall proceeded to make other arrangements for rescue, tend to sustain the version given by Capt. Crone, and that I must find accordingly.

[2, 3] Considering the evidence as a whole, I regard the facts as disclosing a clear case of voluntary salvage, performed under circumstances of more than usual hazard to the property and lives employed in the service. It would subserve no useful purpose to discuss the circumstances in detail, but I may say that they wholly refute the contention that what was done by Capt. Crone was, as disclosed by the successful event, attended by little danger, and that the rescued boat was in fact at no time in imminent peril of being ultimately lost. The question is, not what the actual fact was, as judged by

subsequent events, but what it apparently was to the experienced and intelligent observer at the time the act was performed, since the work of a salver is to be estimated from conditions as they appeared to such observation, and upon which he is justified in acting. It is not to be judged by conditions as actually ascertained by the event. As said in The Roanoke:

"Wisdom born after the event is the cheapest of all wisdom."

Indeed, it is not seriously contended that any of the elements of a true salvage were lacking, if the service was not contractual. 35 Cyc. 720.

Nor is there anything of substance in the second proposition or defense, that the case is one of cosalvage as between the Coaster and the tug. The latter was not a participant in the rescue of the wrecked vessel from any imminent peril; she took her in tow in the open sea, after she had been rescued from the threat of immediate danger of destruction by going ashore; and while her service was of value in carrying her to a safe haven, and thus relieving the Coaster to that extent, and may be considered in determining the ultimate value of the services rendered by the latter, the service of the tug was admittedly rendered under charter or hire by the owner, and is to be regarded more in the nature of a towage than a salvage. The Roanoke, supra. The tug, therefore, cannot be considered in any proper sense as a cosalver.

[4] This leaves but one question for consideration, that of the award of just compensation to libelant for the service performed. While he is entitled to an award which will fully compensate him for the valuable service rendered, I do not regard it as a case justifying an allowance on the extreme basis contended for, that of 50 per cent. of the value of the vessel salved. The basis of such awards, as is conceded by counsel, has been greatly modified by modern conditions, and "there has been a decided tendency by the courts to qualify the grades of salvage services, and to reduce the amounts of awards to salvors from the standard of former days of wooden sailing vessels," etc. Guffey Petroleum Co. v. Borison, 211 Fed. 602, 128 C. C. A. 194, and other cases there cited.

Without further discussion, I am of opinion that under all the circumstances libelant will be reasonably compensated in this case by an award of $750. It would have been different, had he been required to carry the derelict the considerable distance through to Humboldt Bay, which it appears was the nearest point of a safe haven. But he voluntarily surrendered her to the owner, and therefore cannot claim upon the basis of a complete towage to that point. On the other hand, while the amount of the award is in excess of the compensation demanded by libelant before suit, obviously he is not to be circumscribed by the fact that he offered to accept a less sum in amicable adjustment of the controversy. Having been driven to the necessity of litigation, he is to have such award as in the judgment of the court will compensate the services performed, regardless of any previous offer on his part to accept less than that sum. His de-

mand was exceedingly reasonable, and it is unfortunate for the claimants that they did not see their way clear to meet it.

Let a decree be entered, awarding the libelant the sum above specified, together with his costs.