## THE HUTTONWOOD.

(District Court, E. D. New York. November 26, 1919.)

SALVAGE ☞31—COMPENSATION AWARDED FOR SERVICES TO BURNING STEAMER.

Salvage awards made to different tugs for services to a steamship, which took fire in a hold loaded with drums of benzol while lying at a pier, rendered in connection with fire department boats in pumping on the fire and towing the vessel on the flats where she was sunk; the awards being made on the basis of one-half the salved value of vessel and cargo and allowing that seven-eighths of the work was done by the fire boats.

In Admiralty. In the matter of salvage claims against the steamship Huttonwood. Decree for libelants.

Burlingham, Veeder, Masten & Fearey, of New York City, for libelants Dalzell and Old Dominion S. S. Co.

Ward D. Williams, of New York City (Robinson Leech, of New York City, of counsel), for libelant Merritt & Chapman Derrick & Wrecking Co.

Carter & Carter, of New York City, for libelant Gowanus Towing Co., Inc.

Foley & Martin, of New York City, for libelants Lee and Petrie.

Kirlin, Woolsey & Hickox, of New York City, for claimant.

CHATFIELD, District Judge. The Huttonwood is a steel vessel 342 feet in length. On August 6, 1918, she was substantially loaded with a cargo which had been placed on board the vessel while lying at the north side of the pier at Thirty-First street, East River. On the afternoon of that day, with a light wind blowing from the general direction of southeast, and while the captain was absent from the vessel, an explosion occurred in the No. 1 hatch, which a gang of stevedores had filled to within six feet of the coaming. The cargo in this hatch, aside from a small quantity of wire, consisted of drums of benzol. In the No. 2 hatch and in the cross-bunker hatch, various cargo, mostly noninflammable, was stored, while in the two after hatches, lumber and metallic ware of different kinds made up the cargo, except for some 100 or 150 drums of benzol in the No. 4 hatch. The vessel had a naval gun and carried about 75 rounds of ammunition underneath the poop deck.

The first alarm of fire was the explosion in the No. 1 hatch, and at that time or shortly thereafter a number of the stevedores were injured. There was no fire under the boilers of the ship, except that sup-

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

plying the donkey engine, and the crew of the engine room immediately started to rig up the pump connecting with the donkey engine, so as to get a stream of water on the fire. Several minutes were consumed in this work, and in the meantime a tug, the William Rowland, which was lying at the adjoining pier, reached the side of the vessel, followed shortly thereafter by the Henry D. McCord. Neither of these boats was allowed to put a hose on board the vessel, but both of them received an intimation from some one on the vessel that it was advisable to take the boat out of the slip. They made a start to free the lines and move the boat away from the pier, the Rowland actually drawing the stern of the boat out a few feet from the pier, when they were dismissed by the officers of the vessel and told that their services were not only unnecessary, but that they would not be tolerated.

The captain of the vessel appears to have arrived about this time, and his conclusion was that outside help from boats was unnecessary. The fire department, both in the form of land companies and a fire boat, reached the vessel shortly before the captain of the ship. They immediately went to work rescuing the longshoremen from the hold and getting streams on the fire in the No. 1 hold. In the meantime the Baxter, a medium sized tug of fair power, came alongside the port bow, and either with the consent of those then on deck, or without molestation, began to play a hose into the No. 1 hatch.

Upon the arrival of the fire boat the Baxter's hose was left in the hatch, and gradually the flame and smoke seemed to be affected by the water, so that the officers of the vessel were thinking that the fire could be gotten under control, when what has been referred to as the second explosion started a large amount of flame and smoke through the hatchway, driving the firemen back, throwing loose objects into the air, and making it apparent that the inflammable materials in the No. 1 hatch, which would explode only if confined when burning, demanded more help and threatened greater destruction.

At about this time the fire chief in charge telephoned for more help. His request, which was later repeated, resulted in the dispatch of other fire boats, with a deputy chief, who reached the fire in a launch, and finally the chief of the department himself, who came just as the fire was finally brought under control. It evidently was the opinion of the officers of the fire department, as soon as the extent of the fire was seen, that the boat must be removed from the slip. Two reasons have been stated for this: (1) That the fire threatened to endanger the pier and the surrounding water front; (2) that if the fire proved stubborn, and the vessel had to be scuttled, she should not be sunk in the slip, where not only would she obstruct navigation, cause additional trouble in being raised, and be less easily filled with water to the sinking point, but also where her proximity to the piers rendered it extremely probable that, if the piers should get on fire, the vessel could not be either removed or sunk, and would become a total loss. Orders were therefore given to the Baxter, the tug hanging onto the bow, to call for help. But before this call was given by the Baxter, other boats had been attracted by the flames and the sound of the second explosion.

The tug Dalzell, also a tug of fair power and medium size, came

to the assistance of the vessel and contributed particularly in undertaking the movement of the ship away from the pier and towing her out as the hawsers were loosened. The tug Hesperus and the tug Lee, also boats of fair power and medium size, offered their assistance, which was not received with eagerness by the officers of the vessel, but was welcomed by the firemen and was apparently effective in conducting the operation of towing the vessel from the slip. The Hesperus took up her position under the port quarter, passing a line up to the deck of the Huttonwood. The Lee took her position alongside the Dalzell and joined in towing with the Dalzell's hawser. In the meantime another tug, the Victory, of about the same capacity as the Dalzell, Hesperus and Lee, had taken a position on the port bow of the vessel, where she remained, assisting in the throwing of water into the No. 1 hatch, but having nothing to do with the towing of the vessel.

The additional fire boats, as they came to the scene, put out lines to the vessel, and some of them apparently used their own power to maintain their position alongside of the vessel, but none of them took part in the towing. As the vessel was pulled out into the stream, the direction of the wind and the necessity of rounding the water front on the opposite side of the Gowanus Canal compelled the tugs to swing the stern of the Huttonwood further toward the south. As she approached the flats on the opposite side of the Red Hook channel, these tugs continued holding the stern of the vessel in such position that the smoke and flames would go over the side.

In the meantime the vessel was going down at the head from the amount of water which had been pumped into the forward hatches. After the vessel left the slip, the Merritt & Chapman boat Champion, a powerful vessel with large capacity pumps and a derrick for the lifting of cargo, was attracted as she was proceeding up New York Bay, went in and ran alongside of the steamer, and undertook, at the direction of the captain, to remove the cargo of ammunition, which the captain of the Hesperus had been unable to take off. The Champion also assisted in bringing some of the firemen to their boats, and then took her position alongside of the steamer, where she, according to the testimony of her officers, continued to pump water on the flames until the boat settled on the bottom, and then stood by during the night, at the direction of an officer of the Merritt & Chapman Company.

The boat Chapman Brothers brought this officer of the Merritt & Chapman Company from New York at about the time that the deputy chief of the fire department came down in his launch. This boat, the Chapman Brothers, reported to the captain of the Huttonwood, who, upon learning that she came from the Merritt & Chapman Company, allowed her to take a position alongside the fire boats and do all that she could in putting out the fire. She is a boat with very large pumps, and probably compared with the fire boats in the amount of assistance which she rendered in flooding the ship.

With the help of all these boats, the Huttonwood was moved toward the Red Hook flats; it being the evident purpose of every one to sink her in water enough to drown the fire, but at the same time where

the bottom would be soft enough to avoid danger to the Huttonwood, and where the depth of water would not be so great that the cargo could not be saved and the boat raised. As the boat approached the neighborhood of the flats, and apparently while being held at approximately the position in which the various ones in authority expected her to be sunk, her bow took bottom. This fixed the location where the boat was compelled to sink, and the only change thereafter would be to keep her from swinging. The amount of swing was regulated by the direction of the wind, with the result that, when the Huttonwood finally sank, her bow was in 40 feet of water and her stern in 15 feet of water, and it is argued by the Huttonwood that the berth in which she rested was sufficiently uneven to cause some damage to the hull through the resultant strain.

It is apparent, however, that as the boat filled with water at the bow, but was afloat at the stern, no damage could have resulted from the projection of the stern over the crest of the bank. The No. 3 and No. 4 hatches did not leak, except as water worked through into the No. 3 hatch from pressure upon the bulkhead separating it from the forward hatches. The Merritt & Chapman people were able to keep the stern of the Huttonwood dry until the cargo was taken off. The forward holds were finally pumped out by the Merritt & Chapman people, the cargo was taken out, and the vessel raised.

It has been stipulated that the net result was salvage of property, including boat and cargo, aggregating $420,000. This amount has not been definitely divided, but it is apparent that the cost of repairs to the vessel was large. Such benzol as was not consumed was removed in the steel drums and was not injured, presumably, but, aside from the contents of the No. 1 hatch, constituted but a small part of the cargo. The balance of the cargo would receive more damage from water than could be inflicted on these steel drums.

It also appears from the testimony that, as the boat went down, flames and explosive material or burning material was forced up from below decks, and that burning benzol was scattered around over a considerable area. All the boats in the neighborhood pulled away from the vessel to avoid this burning material, and put out the fire upon the water before going to work upon the sunken hull. Some of the tugs followed along the hull, putting out burning cargo wrappings and various articles of equipment, by which the flames were being carried over that part of the boat which was not submerged. These last services, however, were of little consequence, except in so far as they extended the time before the boats left the wreck.

The first proposition presented by these facts is that, if the boat and its cargo had been totally destroyed, there would be no valuation upon which to base a claim for salvage services. As compared with total destruction, therefore, the sum of $420,000 at least remained for the benefit of the claimants. The evidence, as has been stated, leads to the conclusion that the removal of the ship from its berth contributed largely to prevent total destruction. The benzol and the other inflammable cargo would have substantially wiped out any salvage of cargo and probably made valueless the hull of the boat, if the fire had

not been checked in any way, and if the boat had burned until she sank from the effects of the fire upon her interior. The testimony thus indicates that, if the boat had not been removed from her berth, the fire would have spread, and that total destruction of the cargo, and in all likelihood of the boat, would have accompanied any extensive fire upon the pier.

But in opposition to this we must take into account the testimony which indicates that the fire, subject to explosions from time to time, could have been confined to the No. 1 hatch, if the boat had not been in a situation where danger to surrounding property was feared. The testimony shows that the apprehension of the firemen that all of the holds contained material similar to that in hatch No. 1 was unfounded. It was extremely desirable that the fire be stopped before it reached hatch No. 4, or the ammunition at the stern, but the danger from the fire to cargo in the holds aft of the No. 1 hatch was a very different proposition from the fire which the deputy chief of the department anticipated that he would have to fight.

The next proposition that is to be taken into account is that the boat was not landed in the mud in the form in which the salvors intended. As has been said, the bow took the ground, so that the boat could not be drawn upon the shoal entirely away from the channel, and yet the vessels were compelled to sink it where there was sufficient water to drown the fire. While the damage to the steamer from lying upon the uneven bottom was presumably small in comparison with the other damage, it militates against the amount of success in the rescue as planned by the tugs.

Another proposition that must be taken into account is that most of the boats involved in the operation were in comparatively little danger for the greater part of the time. The explosions were around the bow. It was only when the vessel sank that the zone of danger spread, and the Baxter, the Chapman Brothers, and the fire boats were the only tugs which tenaciously and steadily operated close to the No. 1 hatch. Subsequent events proved that the No. 1 hatch was the only likely place from which danger to the tugs could have happened, even though it was reasonable to expect that danger at all points around the boat.

The next proposition that I wish to consider is that the creditable work of the fire department and of the tugs in removing the boat from the neighborhood of the pier and from the slip, if the vessel was to be sunk, cannot be recognized in this action, in the sense of rewarding any saving of surrounding property. The salvage must be limited to the saving of the boat and its cargo alone. The tugs which were not accepted by the officers of the steamer, as rescuers or helpers in the work of rescue, are still entitled to compensation in accordance with the ordinary rules of salvage, inasmuch as the situation justified, not only their offers, but the work which they did, and upon the testimony I find that the officers of the Huttonwood should not have resisted those entering into the undertaking. The evidence does not verify the opinion of these officers that the boat should have been left in her berth, when the Rowland and the McCord attempted first to tow her out. Nor does the testimony justify the action of the officers of the

steamer in assuming that the boat could be towed out casually, by one or two tugs, as an ordinary towing operation. On this account both the Rowland and the McCord should be recognized as salvors, in that they undertook what was an offer and actual rendering of assistance at a time when part of the loss which ultimately occurred could have been prevented, if their efforts had not been frustrated by the action of the officers of the steamer.

The amount of salvage which the Rowland and McCord can be allowed cannot be based upon the amount of property saved directly by what they did; but their position is similar to that of a vessel standing by to render needed assistance, when further danger is anticipated, and where the vessels actually engaged in the direct work of salvage are sufficient to produce the result, if the danger does not increase.

The next proposition that I wish to consider is based upon the presence and actions of the fire department and its boats. Taking the value of $420,000 as property actually saved, and figuring that from the standpoint of total loss an award of approximately one-third or one-half of the value saved might not be extravagant, it is necessary to apportion the value of the services of the fire department and its equipment in considering what should be awarded to the assisting tugs. Credit is always allowed to the fire department, but its services are not customarily estimated in dollars and cents; but in this case it is necessary to divide the whole adventure, as we are dealing with but one part, which has to do with the outside tugs.

I am of the opinion that from three-fourths to seven-eighths of the value of the services rendered should be credited to the fire department and its officers, and, assuming that one-half of the total amount salvaged should be the basis of computation, then I should consider that, remembering the noninflammable character of the greater part of the cargo which was in immediate danger, the fact that much of the inflammable material causing the explosions at the bow was actually consumed, and that the danger was growing less as the water, poured into the boat, rose in the No. 1 hatch, and considering that the sinking of the vessel upon the flats was not of itself necessary beyond the drowning of the forward hatches, and also considering that the placing of the vessel was attended with some miscalculation, due to the effect of the wind, tide, and grounding, I should assume that one-eighth of the 50 per cent., which would represent a maximum, would fairly represent the efforts of the vessels involved.

Now, taking up the proportionate shares, I should attribute to the Baxter the greatest credit and the most valuable services, from the standpoint of a rescuing vessel. She not only went most directly to the point of danger, but she rendered service through her mate and other officers of a high order of courage. The Chapman Brothers also, like the fire boats, was as close to the fire as she could be placed, and her services and her powerful pumps undoubtedly were of great value, and make her worth more than could be represented by the mere pumping of water while lying alongside of a vessel. The Champion rendered sensible and accurate service as requested, and was a powerful enough boat to be of much use, if viewed from her capacity to pump

water. I take it that it is of little consequence whether she actually did pump, or whether her pumping was small. As between the three boats, I should have been inclined to compensate the Baxter as much or more than the other two.

Counsel for the various libelants have placed the aggregate value of their services in such proportion that the total of their estimates would exceed the lump amount which they figure as the salvage prayed for. The libelants Chapman Brothers, Champion, and Baxter request an allowance in the proportions of four parts for the Chapman Brothers, three parts for the Champion, and two parts for the Baxter, out of what may be allowed for these three boats. I feel that the allowance to the Baxter should be at least as large as that to the Champion, and I will yield my original opinion that the Baxter was actually the most meritorious of the three, by giving the Baxter the greatest award in the endeavor of its services, but giving to the Chapman Brothers the greatest monetary compensation.

I consider that the Dalzell, although working at the end of a hawser, rendered services substantially as valuable in most respects as the services actually rendered by the Baxter. But the original entry of the Baxter into the situation, and the fact that the Dalzell did perform her services at a considerable length from the burning vessel, will establish the difference between the awards to the Baxter and the Dalzell. The services of the Hesperus and the Lee are substantially alike in character and in amount, and are considerably less in quantity than those of the Baxter and the Dalzell.

The services of the Rowland and the McCord can be estimated only from the standpoint of a reward for their endeavor. We must also take into account the presence of the Victory and the fact that her services represent as large a share as that of the Dalzell or of the Baxter in most of the elements to be taken into account. In fact, the Victory, from its position near the fire, would require that that vessel be taken largely into account, if it were one of the libelants in the case. I therefore will apportion this one-eighth part with which I am starting, and which amounts to substantially $26,000, so as to take off a substantial portion for the Victory.

It also appears that other tugs were in the neighborhood of the steamer when she was aground on the flats, and that some other tugs were in the slip apparently assisting or looking after the lighters from which the cargo was being placed on the steamer. Some compensation from the standpoint of total available rescuing power must be taken into account, in the presence of these tugs, and added to that which is apportioned as representing the presence of the Victory in reducing the amount to be divided.

I shall allow to the Chapman Brothers $4,000, to the Champion and the Baxter $3,700 apiece, to the Dalzell $3,200, to the Hesperus and Lee $1,750 apiece, and to the Rowland and McCord $500 apiece, and decrees may be entered accordingly.