## THE MELDERSKIN.

(District Court, S. D. New York. June 19, 1916.)

SALVAGE &34—AMOUNT OF COMPENSATION—TOWING SHIP DISABLED AT SEA.
  The steamship Melderskin, a vessel of nearly 4,000 tons gross, while on a voyage from Santos to New York with a cargo of coffee, lost her propeller. On account of the value of the cargo, the master was unwilling to jettison it, and after drifting westward for 9 days, while trying unsuccessfully to ship an extra propeller, and when 180 knots to the eastward of San Salvador, the vessel fell in with the steamship Hesperides, also a large vessel, with a valuable cargo. She took the Melderskin in tow, and after about 10 days, having towed 819 knots, landed her and her cargo safely at Tybee Roads, which was agreed upon as the first available port where repairs could be made. During most of the time heavy seas rendered the towing excessively difficult, although not especially dangerous. No hurricanes were encountered, although it was September and there was always the risk of them. The value of the Melderskin and cargo, with pending freight, was $1,450,000. The value of the Hesperides and freight at risk was $328,000. Held, that the Melderskin was in a position of great danger, being helpless, and her cargo in even greater, because subject to the additional danger of being jettisoned, that the service was efficiently rendered, and that the Hesperides and crew were entitled to a salvage award of $45,000 in addition to her actual expenditures for coal, etc.

In Admiralty. Suit by the British & South American Navigation Company, Limited, owner of the steamship Hesperides, against the steamship Melderskin. Decree for libelant.

J. Parker Kirlin and Mark W. Maclay, Jr., both of New York City, for libelants.

Charles S. Haight, of New York City, for claimant.

---

&For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

HOUGH, District Judge. On September 9, 1915, the Norwegian steamer Melderskin, 360 feet long and 3,961 tons gross, while on a voyage from Santos to New York, broke her tail shaft and totally lost her propeller in latitude 24° 20′ N., longitude 65° 26′ W. She was fully laden with a very valuable cargo of coffee, which there was great unwillingness to jettison. She had a spare propeller on board, and endeavors were made both to navigate under sail and to ship the extra propeller; the vessel, except for this failure of motive power, being tight and in excellent condition. Her log shows that the effort to sail resulted in not even getting steerage way, although there was plenty of wind. Awnings were used to supplement the sails, and the awnings promptly split. Cargo was shifted in order to get her down by the head sufficiently to enable the engineers to work at the sleeve. These efforts continued for several days, until on September 14th the log recites that:

"We stopped shifting cargo, as the ship is now so deep by the bow that the water is coming in through the scuppers when the ship is pitching, and is coming in on the deck; there remains still so much to lift the stern that we find it will be impossible to reach the sleeve unless a large part of the cargo is jettisoned."

The abandonment of the effort to ship the extra propeller left the Melderskin helpless in the trough of the sea, and under the conditions of wind and weather steadily going westward, until on September 18th, having then drifted about 210 knots, she was almost exactly 180 knots eastward of San Salvador Island, and fell in with the Hesperides.

The evidence is persuasive that the condition of the ship was so good and the value of the cargo so great that the captain deliberately preferred to keep on drifting toward the Bahamas rather than jettison cargo, in the hope and expectation of falling in with vessels capable of rendering assistance. Whether he would have continued to drift in the same direction as he consistently did from the time of his accident to the time of meeting the Hesperides cannot be known with certainty, but the subsequent weather experience of the two vessels when in company show that the same easterly swell that had already moved the Melderskin upwards of 200 miles continued for a considerable time. If that drift had continued for another 150 knots, or thereabouts, the ship would have fallen into the path of steam traffic from Colon, Jamaica, and the southerly sides of Cuba and Haiti northward bound through the Windward Passage. Yet as matter of fact the Hesperides subsequently towed the Melderskin across this very path, and without meeting any body of traffic worthy the name. It is quite remarkable that so few vessels were seen, even in the distance, from the time the Melderskin broke down until she was safely in harbor.

September in the region of the Antilles is a "hurricane month." No actual hurricane was encountered, yet the risk thereof was always present. There was no radio apparatus on the disabled vessel. It thus seems to me evident that the dangers to the Melderskin and her cargo at the time the Hesperides encountered her were very real. The ship, with her cargo aboard, was helpless. The cargo was worth more

than twice as much as the ship, and was subjected, not only to the perils of the vessel, but to the additional danger of being jettisoned in order to render it perhaps possible to ship a propeller in a seaway, an operation of the greatest delicacy and never attempted in the experience of any man on board the ship.

The Hesperides is a British steamer, belonging to a regular line plying between American North Atlantic ports and the River Plate, of 3,393 tons gross and 350 feet long. She was fully laden with a valuable cargo and was endeavoring to maintain a schedule sailing. The master of the Melderskin put the whole matter of his rescue in the hands of the Hesperides. The manner of making fast, the rate of towing, and the port of destination were all left to the salving vessel. An attempt to make Nassau was first considered, but abandoned, owing to the ignorance of all parties of local conditions, and a belief that the vessels were too large to attempt the harbor. Jacksonville was next thought of, but abandoned on arrival off St. Johns river, after consultation with local pilots, on account of the tortuous navigation necessary to effect an entrance. In result the Melderskin was towed to Tybee Roads, and there left in good condition.

The towing necessary to accomplish this result was 819 knots, and the time consumed 9 days and 22 hours. There has been a most commendable spirit of fairness exhibited by all the witnesses in not seeking to carp at or unduly minimize the services rendered or the manner in which they were performed. Almost the only criticism of the manner of rendering service arises out of the disposition or arrangement of the towing lines. These lines broke down three times, always parting at the manila portion of the hawsers rigged between the two vessels. The rope used was six-inch, arranged so as to lead on board the Hesperides (after connection with the main steel towing hawser) in many parts in order to distribute the strength. It is said that a heavier rope might have been used. The recognized difficulties of towing such as this are summed up in Knight's Modern Seamanship, p. 351:

"In very bad weather towing should not be attempted, unless exceptional circumstances make it necessary, as the running of lines in a heavy sea is attended by difficulty and danger, and even if they are run successfully the chances are much against their holding."

The logs of the two vessels are unanimous in showing that during most of the time from the inception of the enterprise until the vessels were near St. Augustine Inlet the condition of the sea made towing excessively difficult, though not especially dangerous for the vessels themselves. The Melderskin's log reads somewhat as follows, beginning on September 18th:

"Light wind, high swell, and considerable rolling and pitching." "Northeast swell." "High breaking sea, pitching and rolling."

The log of the Hesperides on September 18th contains the entry: "Light breeze and showery, with heavy beam swell, ship rolling very heavily"—and so continues for several days. These contemporaneous entries convince me that the method of towing is not open to exception. The Hesperides had to look out for her own safety, and it was

better that her hawsers should part in a beam sea and with a larger vessel tailing behind than that her own hull or engines should be imperiled.

. On September 24th, when off and a little below St. Augustine Inlet, the hawser parted at 6 p. m.; the Melderskin's log showing, "High breaking sea, pitching and rolling." The vessels thereupon parted company for the night, and the Melderskin drifted in toward the Florida shore until she anchored. The Hesperides stayed further out and used her wireless to get the assistance of the revenue cutter Yamacraw. That vessel, being of light draft, approached and endeavored to tow the Melderskin, but the hawser parted at once. On the morning of the 25th the Hesperides got near enough to the Melderskin (the weather having moderated) to again make fast, and thereafter the trip to Tybee Roads was without remarkable incident.

It is suggested that the Hesperides did not do all that could have been done when the Melderskin was anchored off the Florida coast. Undoubtedly that was a position of peril, rather potential than actual, for the weather was moderating as the night wore on; but if the squall had increased, instead of diminishing, it would probably have been impossible to save the Melderskin. I do not think that any just criticism attaches to the Hesperides for not approaching nearer while the sea was high; but it is undoubtedly true that, in so far as the peril off the Florida coast was concerned, there was a space of more than 12 hours when the Hesperides was of no assistance, nor do I think she could have been of assistance. The salving vessel herself was at no time in danger. It required skill, watchfulness, and good discipline to keep a constant eye on the towing hawsers, to regulate the speed of the vessel according to the exigencies of weather, and carefully to nurse the Hesperides' engines to keep them from overheating or injury, owing to the strain of so heavy a tow—a kind of work for which they were not designed.

The result of the foregoing is the presentation of the following problem: The property to which service was rendered is valued as follows:

Cargo .................................................. $  913,000.00
Ship .................................................. 469,000.00
Pending freight ....................................... 68,939.42
                                                        ------------
    A total of......................................... $1,450,939.42

The Hesperides was valued at $265,000 and her freight at risk amounted to $63,087.87. During the period of salvage service she expended for coal, oil, hawsers, and other material, and matters rendered necessary by the towage service, the sum of $1,944.83.

It is suggested as an element of salvage award that she was thrown out of her schedule and had to pay overtime at ports of discharge, and also that her operating expenses for the period of delay were very considerable. All this is true, but such matters are not to be separately paid for, but merely considered in arriving at salvage compensation.

. It is also urged by the libelant that this service was rendered at a time when, owing to the European war, every species of marine material is held at very high prices, and rates for vessels and cargo space

are abnormally high; therefore salvage services should be extraordinarily compensated. In all this there is a measure of truth, but the increased amounts asked for are largely taken care of automatically by the fact that the above-given values for cargo, vessels, and freight are enormous as compared with peace prices.

The care of counsel has reminded me of a long line of salvage cases, of which I have especially considered the following, relating to vessels either towing or permitting themselves to be used as rudders, and concerning values of upwards of $1,000,000: The Alaska (D. C.) 23 Fed. 597; The Varzin (D. C.) 180 Fed. 892, affirmed 185 Fed. 1007, 107 C. C. A. 398; The City of Berlin, 32 L. J. (N. S.) 307; The City of Richmond, 25 Mitch. Mar. Reg. 271; The Werra, 12 P. D. 52; The Bremen, 10 Asp. L. C. 229; The City of Lincoln, Mar. Reg. June 2, 1915.

The unusual element in this case is the distance towed, only exceeded, so far as I have observed, in The Werra, supra, though it was approached in The Colon (C. C.) 4 Fed. 469. Having regard to all the circumstances, The Varzin, supra, is the most like upon the facts. Measuring by this case, I am of the opinion that the danger to the Melderskin was not as great as that to which the Varzin was subjected, except during the time when the Melderskin was adrift or at anchor off the Florida coast, and during that period of danger the Hesperides was not responsible, nor could she assist. While the distance towed was here much greater than in the Varzin, the time spent in towage was a half day less; a fact which indicates greater difficulty in the earlier case.

It is to be noted, also, that the boat work necessary to pass hawsers was all done by the Melderskin's crew. The crew of the Hesperides did their usual work for the usual times, with the exception of the watch officers, who, in order to exercise supervision over hawsers, engines, and speed, stood extra watch, with the captain on duty most of the time. While keenly aware that all efforts in salvage cases must result only in approximation, I conclude upon the whole that the same award as was made in The Varzin will be just, to wit, $45,000, with the additional sum of $1,944.83 for actual out of pocket disbursements and expenses. Of this award (exclusive of expenses) one-fifth will be awarded to the master and crew of the Hesperides in proportion to their wages, with the exception that the master, chief, second, and third mates, and the four engineers shall receive a double share out of said one-fifth. This is an expression of my opinion that the meritorious work of the salvors was head work and not hand work.

Costs will follow the decree.