## THE WEST MOUNT. THE JOHN J. TIMMINS. THE MUTUAL.

(Circuit Court of Appeals, Second Circuit. November 16, 1921.)

Nos. 7–8–9–10–11.

1. **Salvage ⚙⇒51—Appeals solely from amount allowed not encouraged.**
    Appeals relating solely to the amount of salvage allowed are not to be encouraged, unless there has been a violation of some principle.

2. **Salvage ⚙⇒31—Allowance of $85,000 for pulling a vessel from proximity to fire held excessive, and reduced to $40,000.**
    Where a vessel of the book value of $1,561,237.40 was lying at a pier without sufficient steam to move it, and because of a fire in a nearby ship called for assistance, and was pulled out and anchored in about 45 minutes after the salvors' services were accepted, and the weather conditions were fine, *held*, that an award of $85,000 salvage was excessive, and should be reduced to $40,000.

Appeals from the District Court of the United States for the Eastern District of New York.

Libels by the Mears Towing Company, Inc., by Andrew H. Mills, Inc., by the Red Hook Towing Company, by Edward M. Timmins, as managing owner, etc., of the steam tug John J. Timmins, and by Edward M. Timmins, as managing owner, etc., of the steam tug Mutual, against the steamship West Mount, in each of which the United States was claimant. From decrees therein, awarding libelant salvors $85,-

⚙⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

000. the claimant in each case appeals. Award reduced to $40,000, to be divided in the same proportions as agreed on by counsel below, and the decree, as thus modified, affirmed.

These suits were brought by the owners (for themselves and the crews) of five tugs, to recover "reasonable and proper salvage" for services rendered to the steamship West Mount in the harbor of New York on April 19, 1920. On that day the West Mount, a steel cargo boat of 5,585 tons gross, built at Seattle in 1917–18, and valued by stipulation at $1,561,237.40 "book value" was lying on the north side of Pier 5, Bush Docks, Brooklyn. Her stern was about flush with the end of the pier; she lay bow in, and some 6 or 8 feet from her bow was the stern of the steamship Halfried, also lying stern in. The West Mount was light. Her auxiliary steam was on, but she did not have steam for her engines; she could not move without the aid of tugs. Her officers were on board. She had practically no deck crew; but of her 24 men in the engine and fire room she had 21 in service. The day was fine and the wind moderate from a westerly direction. The slip in which the vessel lay was 150 feet wide, and egress from it unobstructed and easy.

At approximately 12:30 p. m. on the above date, the Halfried was observed to be on fire. That fire was promptly taken charge of by the New York City fire department. Halfried's cargo, at least that in her forward part, consisted of some rather vaguely described chemicals, which in the opinion of the chief of the fire department made a very bad fire. Several explosions resulted, one of severity sufficient to blow off part of the forward deck of the Halfried and thrown into the air pieces of metal, if not parts of the ship's equipment. Fire on the Halfried was confined to her forward portion; smoke, flames, and cinders were blown by the wind across the pier, and not towards the West Mount.

The master of the latter vessel concluded, after watching the fire for about 10 minutes, to get away. Tugs were numerous in the vicinity; there were "30 or 40" of them. The first offering service was the Mutual; that offer was accepted, and the Mutual's master took charge of moving the West Mount, and selected, or at least accepted, the other four tugs concerned in this cause. In about 30 minutes after the Halfried was seen to be on fire, the West Mount, with her five tugs, moved away. The severe explosion on the Halfried occurred just as they were on the point of starting. No lines were cut; the West Mount received no injury whatever, nor did any of the tugs. In about 45 minutes after the Mutual's services were accepted the West Mount was at anchor, on the anchorage grounds and the episode out of which these suits grew was ended.

For this service the lower court granted a total salvage award of $85,000. This amount the owners of the salving tugs divided among themselves as to them seemed best and entered decrees accordingly. The West Mount was owned by the United States, and it took this appeal.

W. E. J. Collins, U. S. Atty., of Jamaica, N. Y. (Arthur H. Longfellow and John Hunter, both of New York City, of counsel), for appellant.

Chauncey I. Clark, of New York City, for owners of the Mutual and the John J. Timmins.

G. V. A. McCloskey, of New York City, for owners of the Andrew H. Mills, the Gertrude B. Mears and the Caroline M. Wade.

Before ROGERS, HOUGH, and MAYER, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). It was asserted at bar that the decrees complained of were entered upon the consent or agreement of the advocates who tried (as a consolidatd case) these five claims for salvage. After calling for statements from

all of said advocates, and from the trial judge, we are satisfied that, although the District Court believed that an agreement had been reached, it cannot be asserted as a fact that there was any concert of minds to the effect that (1) the services alleged were salvage services, and (2) that they were worth in the aggregate $85,000. That the court below believed itself to be merely registering counsel's agreement is doubtless the reason why we have no considered decision, giving reasons for or seeking to justify the award. Under the circumstances, however, we are compelled to consider this appeal as from a ruling of the court, that in its judgment the evidence showed that $85,000 was "reasonable and proper."

Our opinion in The Niels Nielsen, 277 Fed. 164, filed with this decision, and in a case coming from the same court, dispenses with any lengthened consideration of the rules applicable to salvage generally and harbor salvage in particular. The service rendered the West Mount was of perhaps the most frequent type of harbor service; i. e., the selection in broad daylight from numerous applicants, all eager to earn salvage money, of a sufficient number of tugs to tow out of a berth potentially, if not presently, dangerous, a vessel of no remarkable size.

[1] Doubtless the service amounted to salvage. This appeal relates to nothing but amount; and of such appeals it has been lately said that they are not to be encouraged, "unless there has been some violation of principle." Oelwoerke v. Erlanger, 248 U. S. 521, 39 Sup. Ct. 180, 63 L. Ed. 399. The principles of harbor towage have continuously, and we think consistently, been illustrated in this court from The Bay of Naples, 48 Fed. 737, 1 C. C. A. 81, and The Hanchett, 76 Fed. 1003, 22 C. C. A. 678, to the very recent cases of The Geo. W. Elzey, 250 Fed. 602, 162 C. C. A. 618; The No. 92, 252 Fed. 117, 164 C. C. A. 229, and The High Cliff, 271 Fed. 202.

[2] A reference to these decisions is sufficient to show that by an award of $85,000 for the service above set forth there has occurred a violation of principle. Guffey, etc., Co. v. Borison, 211 Fed. 594, 128 C. C. A. 194, is perhaps the nearest case in the books to the present. In the nature of the danger, the kind of service rendered, and the elements to be considered, the opinion of Pardee, J., renders further consideration by us of the facts herein unnecessary.

It may also be noted, by way of comparison with skillful and difficult deep water salvage, that in The Varzin (D. C.) 180 Fed. 892, affirmed 185 Fed. 1007, 107 C. C. A. 398, and The Melderskin (D. C.) 249 Fed. 776, the values salved were almost identical with the stipulated value in this case; the services were on the high seas, and in each case extended over several days; the salvors displayed great skill as mariners, and the owners' property was exposed to far greater danger of permanent injury than in this case; yet in each instance the award, after much consideration, was $45,000.

It is, however, seriously urged that salvage awards should now be greater than they were at the time of most of the decisions hereinabove referred to, because the dollars in which they are paid are not worth as much as they used to be. It is just as true that the dollars in which

the salved ship's value is expressed are similarly depreciated, and it is in consideration of such values, inflated because of depreciation, that awards are made. The relation between what is salved and what is paid for the salvage necessarily remains unchanged, as long as both value and award are expressed in the same monetary units. But the mere money value of what is salved is never the leading consideration in making award.

The award of $85,000 is reduced to $40,000, to be divided in the same proportions as was agreed upon by counsel below, and the decrees, as modified by this opinion, are affirmed.