### THE THORVALD HALVORSEN.

(Circuit Court of Appeals, Second Circuit. April 25, 1922.)

#### No. 274.

1. Salvage ☞51—Decision in salvage cases not disturbed merely because appellate court would have awarded slightly higher or lower figure.

On appeal in salvage cases the Circuit Court of Appeals will not interfere with the District Court's decision merely because as an original question the Circuit Court of Appeals might have awarded a slightly higher or lower figure.

2. Salvage ☞31—$15,000 salvage award to steam tug, and $421.60 award to its master, for towing steamship from fire, held not excessive.

$15,000 awarded to steam tug, and $421.60 awarded to its master, for salvage services rendered steamship of 6,570 tons gross, valued at $1,375,000, with cargo valued at $850,000, in towing her from pier when vessel on other side of pier caught fire, after such steamship called for help, *held* not excessive.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**3. Salvage** ⊜⇒31—**Award of $3,000 to each of five tugs and lighters assisting steam tug in towing steamship from proximity of fire not disturbed.**

Award of $3,000 salvage to each of five tugs and lighters for assisting steam tug in towing steamship valued at $1,375,000, with cargo valued at $850,000, from pier because of burning vessel on other side thereof, rendered after master of tug had called for assistance, at a time when it was necessary to tow the steamship to a safe location as speedily as possible, not disturbed on appeal.

Appeal from the District Court of the United States for the Eastern District of New York.

Consolidated salvage suits in admiralty by Henry Gillen's Sons Literage, Inc., and others, against the steamship Thorvald Halvorsen and her cargo, claimed by K. Lied, and the lighters Liberty No. 26 and her cargo, the Dauntless and her cargo, claimed by the American Cotton Oil Company, and the Central Railroad of . New Jersey No. 206 and her cargo. Decree for libelants (The Hallfried, 278 Fed. 536), and claimants appeal. Affirmed.

Appeal by the claimants of the steamship Thorvald Halvorsen and cargo and the cargoes of the lighters Liberty No. 26, C. R. R. of N. I. No. 206, and barge Dauntless from a final decree of the District Court for the Eastern District of New York, awarding about $31,000 to the salvors in ten salvage suits by the owners, masters, and crews of the steam tugs Nonpareil, John Nichols, Richmond, and Robert Palmer and the steam lighters William J. Gillen and Barton Bros. against the Halvorsen and her cargo and the several lighters and their cargoes, for services rendered during a fire on April 19, 1920. The ten suits were consolidated and tried together.

The District Court awarded $15,000 to the Nonpareil for salvage services rendered the Halvorsen and her cargo, and $340.55 for services rendered the cargoes of the lighters. An additional award of $421.60 was made to the master of the Nonpareil, who had charge of and took the responsibility for the service. $15,000 was distributed equally among the tugs John Nichols, Richmond, and Robert Palmer and the steam lighters William J. Gillen and Barton Bros. By stipulation the awards against the lighters and their cargoes were in the same ratio to their respective values as the award against the Halvorsen and her cargo, and were apportioned in the same manner.

The Halvorsen is a Norwegian steel single screw steamer of 6,570 tons gross and 4,068 tons net register, equipped with oil burners; length 414.5 feet, beam 54.2 feet, and depth of hold 28.1 feet. She was built in 1910. Her value was stipulated at $1,375,000, and her cargo at $850,000. The agreed value of the three lighters and their cargoes was $63,153.33, making a total salved value of $2,288,153.33.

Haight, Smith, Griffin & Deming, of New York City (John W. Griffin, of New York City, of counsel), for appellant the Thorvald Halvorsen.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark and William J. Dean, both of New York City, of counsel), for appellees.

Alexander & Ash, of New York City (Edward Ash, of New York City, of counsel), for the Robert Palmer.

Foley & Martin, of New York City, for Henry Gillen Sons Lighterage, Inc., and Richmond Towboat Co., Inc.

Leo J. Curren, of New York City (George V. A. McCloskey, of New York City, of counsel), for John E. Moore & Co.

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Before ROGERS, MANTON, and MAYER, Circuit Judges.

MAYER, Circuit Judge (after stating the facts as above). These ten causes all grew out of the same fire as is described in The West Mount (C. C. A.) 277 Fed. 168. In view of the decision in that case our task is largely confined to one of comparison. The following rough diagram, not drawn to scale, pictures the general location, particularly of the Hallfried, the West Mount, and the Halvorsen:

The fire started about 12:50 p. m. on April 19, 1920, in the forward hold of the Hallfried. The Halvorsen, it will be noted, was lying bow in, middle berth, on the south side of Pier 5. Two lighters, Central R. R. of New Jersey No. 206 and Dauntless, both loaded with oil, were made fast to her starboard quarter, while the lighter Liberty No. 26 was moored under her starboard bow and several lighters were moored under her stern. A strong ebb tide was running, the wind was N. W., 25 miles an hour, and the weather fair. It is satisfactorily established that the wind carried sparks and burning embers diagonally across Pier 5, and in that connection it will be remembered that in The West Mount, supra, we pointed out that "smoke, flames, and cinders were blown by the wind across the pier, and not towards the West Mount." Shortly after the first alarm, at 12:50 p. m., the first company of the fire department reached the scene; Acting Chief Deputy Langan arriving at 12:55 p. m.

The master of the Halvorsen was not on board, and the chief and third officers went across the pier to the Hallfried, leaving the Halvorsen in charge of the second officer. After talking over the situation with the second engineer, the Halvorsen's second officer concluded to shift her away from the pier, and consequently he sounded five or six blasts as a signal for the chief and third officers to return and for the tug Nonpareil, which was then standing by the Stagpole, to come alongside the Halvorsen. The Nonpareil responded immediately, and the second officer of the Halvorsen asked Capt. Deakin of the Nonpareil to tow the Halvorsen out into the stream; she having no steam on her main engines. Deakin went on the Halvorsen's bridge and took complete charge of moving her out. Up to this time only minor explosions had occurred, but the situation was full of potential danger. The second officer had meanwhile ordered the pumps started and the ship's fire hose manned. While the Nonpareil was getting a line from the Halvorsen's stern, the chief officer returned, and, according to Gabrielson, the second officer, he said to Gabrielson:

"It is not necessary to go from this pier, but when you are started you can go on; that would be on the safe side."

The Nonpareil towed the Halvorsen, with three lighters alongside, toward the mount of the slip. Other tugs came to her assistance at various stages of the maneuver, as will be pointed out infra, and the Halvorsen finally was taken out into the stream, where she was anchored abreast of Pier 3 at 1:30 p. m., and during all this time she had not used her own power.

The fire increased, and when Chief Langan learned the nature of the cargo on the Hallfried, he ordered the firemen off the ship, and it was not long before a severe explosion blew off the Hallfried's forward deck and hurled a winch into the air, which fell through the rock pier roof. Several other heavy explosions followed, and, according to Gabrielsen, about three or four "pieces of sparks about a foot or two long * * * fell down on the fore part, the forecastle head, of the Halvorsen."

Ward, a fire captain designated as acting chief of a battalion, called as a witness on behalf of the Halvorsen, referred to three barges or lighters, the nearest of which was about 100 feet from the Halvorsen. This closest boat was afire with kerosene, the center boat had steel drums of benzol, and the boat farther out shore had gasoline in cases. Asked how much the fire on these boats amounted to, Ward answered that "they were covered with a canvas cover, and the fire burned part of the covers off, and burned some of the cases that covered these cans of oil, and caused some of them to open," but that he had no difficulty in controlling that situation. Langan, however, with 34 years' experience in the New York fire department stated:

"I have never had a fire similar to that in my experience; they were throwing the donkey engines off the deck, and rolls of paper were blown I don't know how high in the air, and it set fire to the pier. There was no telling where they were going to stop, and that is why I required additional help."

Asked whether he considered that there was "any danger to the lives of those working around there from that fire," Langan answered, "I certainly did." In any event, in the opinion of fire department officials, the situation was serious enough to call for a second alarm at 1:15 p. m., a third at 1:18 p. m., a fourth at 1:20 p. m., and thereafter a special call for the assistance of railroad tugs serving as auxiliary fire boats.

The conflict of testimony so familiar in cases of this character is found in this record; those seeking awards, perhaps, exaggerating the danger and those resisting awards minimizing the salvage services to the lowest degree. It will not be profitable to analyze, compare, and contrast the testimony of the various witnesses set forth in this somewhat elaborate record. Now that the event is over, it is easy to show the situation in the light of what has occurred; but acute dissection of this character is not the guide to a just conclusion. It is very difficult, even for men with a gift for graphic description, to picture a scene such as this. A potential grave danger threatened the Halvorsen. It was no time for nice calculations as to how the wind would blow, or how many explosions on the Hallfried were to be expected, or in what direction the débris would be thrown and would fall. If the owners of that vessel had been present, they would have been keen to exert every effort and take every means to cause her to be towed as swiftly as possible to a place of safety, and they would not have debated much about the cost, in the face of imminent danger and of undefined possibilities.

Deakin, according to this record, did not rush to earn salvage money for his boat, his crew, and himself, but took action at the request of those entitled at the time to speak for the Halvorsen. It was pointed out in The West Mount that appeals in salvage cases as to amounts are not to be encouraged, "unless there has been some violation of principle." Olewerke v. Erlanger, 248 U. S. 521, 39 Sup. Ct. 180, 63 L. Ed. 399.

[1, 2] We can readily understand that men of the requisite training, called upon to determine such questions, might differ as to exact figures, just as juries do; but unless there is a violation of principle, as illustrated in cases like The West Mount and The Niels Nielson (C. C. A.) 277 Fed. 164, an appellate court will not interfere with a decision below merely because, as an original question, the appellate court might have awarded a slightly higher or lower figure. The services rendered by the Nonpareil and its master were prompt, intelligent, and effective, and taking into consideration the value of the salved property, the danger of the situation, and all other accepted elements which enter into an award for salvage, and comparing the facts with those in The West Mount, supra, we think that the awards to the Nonpareil and Deakin should not be disturbed.

[3] The District Court awarded $3,000 each, or an aggregate of $15,000, to five assisting craft. The testimony shows that Deakin realized the necessity of towing the Halvorsen to a safe location as speedily as possible, and that the Nonpareil could not accomplish this task alone. Deakin, therefore, blew for assistance, and, as near as

we can determine from the testimony, the assisting craft came in the following order: (1) The Robert Palmer; (2) the Richmond; (3) the Nichols; (4) the Barton Bros.; and (5) the Gillen. The Palmer "got a line on the Nonpareil's bow and made fast to her (Palmer's) stern, tandem fashion," when the stern of the Halvorsen was almost cut even with the end of the pier. As the Halvorsen was 414.5 feet in length, her bow was still in the slip, probably 425 to 450 feet. While there was a slight difference in time in the arrival of these five boats, they did substantially the same service in one form or another. Their services must be viewed as a whole in the particular circumstances of this case, and we cannot say that five was an excessive number in this situation.

When these five boats respectively made their lines fast, it was still the part of caution to tow the Halvorsen out into the stream with expedition, and while the potential danger had greatly decreased, it had not entirely ended. If, as an original matter, we were apportioning the amount to be awarded to each of these five boats, we might perhaps, have dealt with the figures in a slightly different way; but as pointed out supra, interference with awards in the District Court in cases of this character is only justified when there is a violation of principle. We find no such violation here, and we think that, viewing all of the circumstances, the services rendered by these five boats just about equaled the services rendered by the Nonpareil.

Decree affirmed, but without costs or interest.