## THE SANTA BARBARA.

### CURTIS BAY TOWING CO. et al. v. GRACE S. S. CO.

(Circuit Court of Appeals, Fourth Circuit. May 6, 1924.)

No. 2185.

1. Admiralty ⊜118—Finding as to amount due for salvage services not disturbed on appeal, unless based on erroneous principle of law, or plainly inadequate.

Appellate court will not disturb lower court's finding as to amount due for salvage services, unless the sum fixed is based on some erroneous principle of law, or is plainly and manifestly inadequate.

2. Salvage ⊜31—Allowance of $1,000 for salvage services held inadequate, $8,-500 being reasonable and just.

Allowance of $1,000 to three tugs and their officers and crews for salvage services in pulling ship from burning pier and extinguishing fire on ship *held* inadequate allowance; $8,500 being just and reasonable.

Appeal from the District Court of the United States for the District of Maryland, at Baltimore; John C. Rose and Morris A. Soper, Judges.

Libel in admiralty by the Curtis Bay Towing Company against the Grace Steamship Company, owner and claimant of the steamship Santa Barbara in which the Baker-Whiteley Coal Company and the Chesapeake Lighterage & Towing Company intervened. From a decree (284 Fed. 365), giving them insufficient relief, libelant and interveners appeal. Decree modified.

See, also, 299 Fed. 147.

H. N. Abercrombie, George Forbes, and George Weems Williams, all of Baltimore, Md. (L. Vernon Miller and Henry L. Wortche, both of Baltimore, Md., on the brief), for appellants.

Joel W. Massie and Stuart S. Janney, both of Baltimore, Md. (Barry, Wainwright, Thacher & Symmers, of New York City, Janney, Ober, Slingluff & Williams, of Baltimore, Md., James K. Symmers, of New York City, and R. E. Lee Marshall and Frank B. Ober, both of Baltimore, Md., on the brief), for appellee.

Before WOODS and WADDILL, Circuit Judges, and WATKINS, District Judge.

WADDILL, Circuit Judge. This is an appeal by the Curtis Bay Towing Company, owner of the tug Ashwaubemie, the Baker-Whiteley Coal Company, owner of the tug Elma, and the Chesapeake Lighterage & Towing Company, owner of the tug Cecil, from a decree of the United States District Court for the District of Maryland, awarding to the appellants the sum of $1,000 for certain salvage services rendered to the steamship Santa Barbara, to be apportioned among the owners on the basis of $400 to the Ashwaubemie, $400 to the Cecil and $200 to the Elma, with directions that one-fourth of the amount awarded to each be paid to the officers and crews of the respective tugs.

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The original libel was filed by the Curtis Bay Towing Company, owner of the tugs Curtis Bay and Ashwaubemie, and the owners of nine other tugs filed their libels and intervening petitions, also asserting claims for salvage services rendered to the Santa Barbara on the same occasion. The facts are substantially as follows: .

On the 8th of May, 1922, the American steamship Santa Barbara was lying bow in moored to the east side of Pier 8, at Canton, Baltimore harbor. She was 9,000 tons dead weight capacity, 404 feet long, 53 feet beam, and valued ·at from $300,000 to $350,000. Her cargo of· nitrate had been discharged on Pier 8, and she had in her lower tanks, which were about amidships, 400 tons of fuel oil. Pier 8 runs about north and south, and is 800 to 900 feet long. The pier to the south, referred to as 9 and 10 indiscriminately, is about 1,500 feet long, and the distance between the two piers 150 to 200 feet.

About 1 o'clock, or a few minutes thereafter, in the afternoon of the day in question, fire broke out in the shed of Pier 8 in the nitrates stored therein, quickly enveloping the pier and ship with flame and smoke. A workman upon the pier, engaged in cleaning up the· same incident to the landing of the nitrate, and who seems to have been the first to discover the fire, immediately rushed to the ship and hollered to the mate on deck to get the ship out as soon as possible, as the pier was going to burn up. The pier was soon a mass of flames, and every effort was made to cast off the lines of the ship, which efforts were in the main successful. The wind carried the flames directly over the ship, the vessel catching fire immediately. An explosion of nitre on the pier threw burning débris on the ship, setting the same on fire from amidships forward. Her hatch covers, tarpaulins, masthead, bridge, rigging,. and the interior of some of the cabins were blazing, and her plates on the port side were hot. The pier, on which was a wooden house, was completely destroyed.

Everything indicated a serious fire, and the peril of the ship was alarming from the first. Her difficulties were increased by the great volume of smoke which. poured over the vessel, rendering it almost impossible to see objects at any distance. The ship's captain was not on board. All of the crew not on shore leave, with the exception of the first officer, chief and first assistant engineers, two seamen, and a wiper, abandoned the ship, taking to the lifeboats or going over the side. The ship's steam was off, with the exception of that of the auxiliary boiler. In this situation, the first officer sought the services of a tug. When he finally saw the funnel of one, and believed that she had picked up his line, he set to work amidships to prevent the fire from spreading as best he could with the use of the ship's hose and the donkey engine. Other tugs quickly arrived, and joined in the removal and rescue of the burning ship. Upon the ship's stern lines being cast off, the westerly wind carried her stern towards Pier 8, leaving likely one of the bow lines still made fast to Pier 8, which, upon the tugs pulling the ship out, gave way.

Appellants' tugs were each large vessels. The horse power of the Cecil was between 250 and 300, that of the Ashwaubemie between 700 and 800, and of the Elma about 350. These tugs were ample to pull

the ship from the burning pier, and they did complete the service, and anchored the vessel at a distance of possibly three-quarters of a mile away. The time occupied by the tugs was about an hour and a half. The fire was extinguished as the result of efforts of the tugs of the appellants, and other tugs participating in the service, and two harbor tugs belonging to the city of Baltimore, one or both of which used hose on the steamship, and with such success that it only cost the shipowners some $8,000 to make necessary repairs resulting from the fire.

The peril to the ship, in the circumstances in which she was placed, was manifest, and required considerable skill on the part of the tugs rescuing her to place her in a safe anchorage, by reason of the narrowness of the channel and the slips within which the service was performed, and the existence of lumps in the river bed and shoal water along the course. The danger arising from the prescribed space in which it was necessary to render the service applied, not only to the ship, but to the tugs. One of them actually grounded during the service. The danger to the officers and crews was not serious in the result, though it presented in the position of the burning ship, and the effort to seize its lines and extricate it from the flames in which it was enveloped, caused by the explosion and burning débris and smoke arising therefrom, perils not free from hazard. This situation was greatly accentuated by the fact that there was in the ship's tanks, about amidships, and over which the fire was raging, some 400 tons of fuel oil, which added to the danger, and increased the necessity for prompt removal of the ship.

On the final hearing upon the pleadings and proofs, most of the testimony being taken in open court, the original libel so far as the tug Curtis Bay was concerned, was dismissed, as were also all of the intervening libels and petitions, save those of the owners of the tugs Cecil and Elma, and the court decreed in favor of the original libelant, Curtis Bay Towing Company, owner of the tug Ashwaubemie, the Baker-Whiteley Coal Company, owner of the tug Elma, and the Chesapeake Lighterage & Towing Company, owner of the tug Cecil, for the sum of $1,000, partitioned and apportioned as hereinbefore stated. From the decision thus rendered, this appeal was promptly taken, based upon the insufficiency of the sum awarded.

[1] The sole question presented by the appeal is as to the amount of the award and the correctness of the apportionment of the same among the parties entitled thereto. The well-recognized rule in admiralty that appellate courts will not disturb the finding of the lower court on questions of fact, unless plainly not in accord therewith, arises upon this appeal, and especially so as this is a claim for salvage, and the ascertainment of awards in such cases are in the nature of assessments of damages, as to which minds naturally differ, and hence, unless the sum fixed is based upon some erroneous principle of law, or is plainly and manifestly inadequate, the appellate court will not disturb the finding.

The right of the appellants to recover is no longer an open question in this case, as no cross-appeal was taken, and therefore the sufficiency of the amount awarded, and whether in the circumstances the same

should be increased, and the apportionment of the amount between the parties need only be considered. The Supreme Court of the United States in The Ariadne, 13 Wall. 475, 20 L. Ed. 542, discussing the weight to be given to the decision of the lower court in admiralty, based upon a finding of the District and Circuit Courts, at page 479 (20 L. Ed. 542), said:

"The right of appeal to this court is a substantial right, and not a shadow. It involves examination, thought, and judgment. Where our convictions are clear, and differ from those of the learned judges below, we may not abdicate the performance of the duty which the law imposes upon us by declining to give our own judicial effect."

In the case of The Kia Ora, 252 Fed. 507, at page 509, 164 C. C. A. 423, 425, a salvage award, this court said:

"A doubt, or even a decided inclination to differ, does not warrant interference with the finding of fact of the trial court, and this is especially true as to the amount to be allowed in salvage cases; but when a careful examination of the evidence in all of its bearings results in a clear and certain conviction of the appellate court, differing from the finding of the trial court, it is the duty of the appellate court to follow that conviction."

The elements entering into a proper salvage award, are too well understood to need repetition (The Blackwall, 10 Wall. 1, 19 L. Ed. 870); and what was said by this court, speaking through Judge Woods, in the Kia Ora Case, 252 Fed. 507, 164 C. C. A. 423, supra, properly applies to and has particular relation to this case. At page 508 (164 C. C. A. 424) he said:

"The consideration of all these elements should result in an award which will express reasonable actual compensation for the labor, risk, and skill of the salvor and the use of his vessel and appliances, and an added amount based on the degree of peril of property and life and the value of the property saved and lost sufficient to promote the highest degree of readiness and efficiency for the relief of vessels in distress."

Citation of a few of the many cases bearing especially upon the amounts of awards in fire cases occurring in harbors, may be reviewed with profit:

In The Connemara, 108 U. S. 352, 2 Sup. Ct. 754, 27 L. Ed. 751, a steamship while at anchor about 11 o'clock at night in the Mississippi river, moored with a tug having her in tow, caught fire. The fire broke out in the poop above the main deck, and was extinguished in 15 or 20 minutes, by the tug, its officers, and three passengers, little damage being sustained by the ship and cargo. There was no risk or damage to the tug, or injury to the salvors. Other assistance was at hand. The Supreme Court approved an award of 6 per cent. on $236,637, the value of the ship and cargo—that is, $14,198—and reduced the amount of the lower court's award of 8 per cent.

In the Avoca (D. C.) 39 Fed. 567, a decision by Judge Benedict, of the Eastern district of New York, an award of $5,000 was made for towing an oil-laden bark from the vicinity of a burning pier. The bark and its cargo were valued at $70,000, and the time consumed 20 minutes. There was other assistance at hand, and no special hazard or skill involved in the performance of the service.

In The Bay of Naples, 48 Fed. 737, 1 C. C. A. 81, an award of $12,-000 upon a valuation of $81,000 was made by the Circuit Court of Appeals for the Second Circuit, reducing an award of $20,000 made by the District Court. The ship was laden with petroleum in wooden cases, and its removal necessitated prompt service. The time consumed was five hours, and the salvors encountered no special peril, and rendered no unusual service. Other assistance was readily at hand.

In The Boyne, The Volage (D. C.) 98 Fed. 444, an award of $9,473.-94 was made against the two ships and their cargoes, valued at $240,-000. The service rendered consisted of hauling the ships from the end of a burning pier at Newport News, Va., into a place of safety in the stream. The time taken was 15 or 20 minutes, and the service performed by a tug valued at $12,000. There was no other assistance readily at hand, and the ships were in great peril.

In The Saxoleine (D. C.) 210 Fed. 683 (Southern District of New York), six tugs participated in salving a ship valued at $250,000. An award of $18,250 was made. The facts in the case are not given as fully as might be desired, but it seems evident that not a great deal of time was consumed, and the elements of peril to which the ship and its salvors were subjected were in some respects like the case here, though that was an oil fire case.

In The George W. Elzey, 250 Fed. 602, 162 C. C. A. 618 (C. C. A. 2d Circuit), an award of $13,500 was made to a tug for towing the schooner, valued at $30,000, from a pier on which war munitions were stored. Not more than three hours were consumed, and the vessel was moved some 1,500 feet. The city fireboat participated in the venture. The appellate court reduced this award to $7,000, the salvor having allowed the property to be depredated on while in his possession.

The Huttonwood (D. C.) 262 Fed. 452, was an effort to salve a vessel loaded in part with explosives. The ship had to be taken from a pier across the channel to the flats, where she sank, her bow being in 40 feet of water and her stern in 15 feet, it having become necessary to flood the vessel to save her and her cargo. The award was made upon the value of the property salved, which the court placed at $420,000, and allowed to the nine tugs participating in the service $26,000, certifying at the time that seven-eighths of the service was performed by city tugs.

The West Mount, 277 Fed. 168 (C. C. A. 2d Circuit): The ship in this case, valued at $1,561,237.40, was in a slip in the harbor of New York, astern of the steamship Hallfried, and on the opposite side of the pier from the ship Halvorsen. The fire developed on the Hallfried. The West Mount was without steam to operate her engines. The fire was on the forward portion of the Hallfried, and the wind blew smoke and cinders, etc., away from the West Point. It was concluded to move the latter ship, and five tugs participated in the service, consuming some 45 minutes. No damage was sustained either by the ship or the tugs. The District Court made an award of $85,000, which the appellate court reduced to $40,000.

The Halvorsen, 281 Fed. 506 (C. C. A. 2d Circuit): This ship was lying in the harbor of New York at a pier on the opposite side of which

the Hallfried, referred to in the last paragraph, was on fire. The ship was without steam, and her officers engaged the tug Nonpareil to tow her out into the stream. While this was being done, an explosion occurred on the Hallfried's forward deck, followed by several others, and three or four pieces of burning material or sparks fell on the forecastle of the Halvorsen. The latter vessel was valued at $2,000,000. Five tugs participated in the ship's removal from the pier. The District Court allowed $3,000 to each tug, a total of $15,000. This award was affirmed by the Circuit Court of Appeals. What was said by Judge Mayer, speaking for the appellate court, has peculiar application to the facts of this and similar cases involving salvage awards in fire cases. At page 510 he said:

"Now that the event is over, it is easy to show the situation in the light of what has occurred; but acute dissection of this character is not the guide to a just conclusion. It is very difficult, even for men with a gift for graphic description, to picture a scene such as this. A potential grave danger threatened the Halvorsen. It was no time for nice calculations as to how the wind would blow, or how many explosions on the Hallfried were to be expected, or in what direction the débris would be thrown and would fall. If the owners of that vessel had been present, they would have been keen to exert every effort and take every means to cause her to be towed as swiftly as possible to a place of safety, and they would not have debated much about the cost, in the face of imminent danger and of undefined possibilities."

[2] Having given full consideration to this case in all its bearings, the court's conclusion is that the amount awarded by the District Court to the appellants is plainly inadequate for the services rendered; that an award to the three tugs and their respective officers and crews of the sum of $8,500 therefor is reasonable and just, and the least that should be made under the circumstances, which is accordingly given.

In fixing the allowance made, the court has not been unmindful of the fact that the service should be treated as salvage of a low order of merit, by reason of its being a harbor service, with other assistance at hand. Nor has the fact that the city fireboats participated in the rescue been lost sight of. The amount allowed to the salvors has been fixed, having regard to the fireboats rendering the fullest service that could be claimed for them, though the court can but feel that under the circumstances of this case, their contention is far stronger than the facts warrant. These public fireboats should be accorded the greatest consideration, and every facility afforded them in fighting fires. Here the peril to the Santa Barbara was largely due to the fact that the city's fireboat first arriving on the scene immediately set about, without in any manner safeguarding the ship, to extinguish the fire in the burning cargo on the pier, which from its inflammable nature caused explosions, throwing flames and burning débris upon and setting fire to the ship; and the contention of the second fireboat, that arrived after the ship was under control of the tugs and moving out of the slip, that the fire could have been more readily extinguished by having the moving ship held in position so that it might direct its hose as well on the ship as on the pier, was an entirely impracticable thing to do, as, of course, the officer of the ship to whose rescue the tugs had come, and moved her away from the fire, would never have consented to such action as that, had

it been possible for the tugs to have executed such maneuvers under the circumstances.

The court has given much consideration· to the apportionment that should be made of the award herein between the appellants respectively, and what would be a proper share of the same to be given to the officers and crews of the several tugs, and the conclusion reached upon the whole case is that the basis of division between the tugs and between the officers and crews, as made by the District Court of the sum awarded by it, should be followed herein; that is to say: After deducting one-fourth of the award of $8,500 for the officers and crews of the tugs, to be distributed among them on the basis of their several salaries and wages, viz. the sum of $2,125, of the remainder of $6,375 there should be decreed to the owners of the tug Ashwaubemie the sum of $2,550, to the owners of the tug Cecil $2,550, and to the owners of the tug Elma $1,275; the amounts to be paid for the officers and waubemie $850, to the tug Cecil $850, and to the tug Elma $425.

The decree of the District Court will be modified in accordance with the views herein expressed, with costs to the appellants.

Modified.