## THE DALZELLEA.

## THE CENTRAL UNION STOCKYARDS NO. 104.

## DALZELL v. CENTRAL UNION STOCK-YARDS CO. et al.

## THE OSPREY.

## THE CLAIRE A. MORAN.

District Court, S. D. New York.
June 13, 1935.

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark and Adrian J. O'Kane, both of New York City, of counsel), for libelant.

Duncan & Mount, of New York City, for Central Union Stockyards.

GODDARD, District Judge.

This libel was filed by the managing owner of the tug Dalzellea in behalf of the master and crew of the tug for salvage services rendered by the Dalzellea to the cattle float Central Union Stockyards No. 104, her cargo and freight owned by the Central Union Stockyards Company, the claimant respondent. The trawler Osprey, Portland Trawling Company, are impleaded claimants, and the tug Claire A. Moran, the Moran Towing & Transportation Company, are also impleaded claimants.

On October 5, 1928, at 7:55 o'clock in the morning, the tug Dalzellea was assisting with two other tugs in towing the steamship Sixaola down the East River toward the Battery; the Dalzellea being ahead of the steamer on a hawser. The tug Claire A. Moran, with the cattle float Central Union Stockyards No. 104, laded with 3,389 lambs and 204 cattle, in tow on her starboard side, was bound up the East River. The trawler Osprey, bound from Tebo's Yacht Basis via Buttermilk Channel, was also coming up the river. About off Pier 6, East River, the Osprey came into collision with the starboard side of the cattle float, cutting a gaping hole in the side of the cattle float above and below the water line about amidship. The Moran signaled for help, and the Dalzellea immediately cast off the hawser to her tow and went to the assistance of the cattle float, which was filling with water and seemed in imminent danger of sinking. The Dalzellea put out a line to the bow of the float and the Dalzellea's master went on board the float and took charge of the rescue operations.

After turning the float so that it was headed down the river, the Dalzellea took a position on the starboard side of the float so as to cover as much as possible the hole in its side and made fast to the float. Mattresses, coal bunkers, and other available articles were stuffed in between the tug and the float by the Dalzellea's crew in an effort to close the hole as much as possible and to prevent water from entering. The intention of the Moran tug was to endeavor to reach shallow water and beach the float, if possible, as it was thought to be useless to attempt to land the float at any of the East River piers because they were all too high to permit the discharge of the sheep and cattle from the float, and it seemed unlikely that the cattle float would be kept afloat long enough to reach the cattle piers in Jersey City. However, Captain Howell of the Dalzellea happened to know that on Governors Island there was a dock with runways for the discharge of animals, and under his orders the flotilla proceeded to Governors Island, which it safely reached, and as soon as gangways could be placed

into position, the crew of the Dalzellea and others went into the pens and succeeded in driving the animals out of the pens of the float onto the dock, so that they were practically all saved. The cattle float was then towed by the Dalzellea and the Moran to Crane's Dry Dock at Erie Basin, Brooklyn, but sank at about 11:30 a. m. before she could be gotten into dry dock.

The value of the libeled stock, freight, and feed on the boat was $76,301.55; the value of the cattle float in sound condition was $17,000, which was damaged to the extent of $6,897.47, leaving a net salved value of $86,404.08. The stipulated value of the Dalzellea was $65,000. The material facts are admitted, and it is also conceded that the services rendered by the Dalzellea constituted valuable salvage service, but it is contended that they were not of high order of merit.

The libelant urges that it is entitled to an award of $18,000 for its services; the claimants take the position that $1,500 would be a proper award for the services.

The policy of the courts has been not to so limit the award for salvage services as to discourage seamen, because of danger to their own vessel and themselves, from rendering prompt aid to another vessel in distress, and not to make the award so large as to encourage unnecessary services. Each case of salvage is to be disposed of on its own merits, but there are certain elements or attending circumstances upon which an award should be based. These are well known and it is unnecessary to repeat them here. See The Blackwall, 10 Wall. (77 U. S.) 1, 19 L. Ed. 870.

■ It must be acknowledged that the Dalzellea and her crew assumed a considerable risk when she was made fast alongside the gaping hole in the cattle float, and it was apparent that the float was in a sinking condition, for soon after the Dalzellea made fast to it, the float began to list and the list was gradually increasing. If the cattle float had capsized while the tug was made fast to her in this position, the float might have turned over onto the Dalzellea or pulled her over before the tug could have gotten clear. That the float was in imminent danger of sinking is shown by the fact that even after she was relieved of her heavy cargo and before she could be gotten to the dry dock, she did sink notwithstanding the aid given by the Dalzellea in placing herself alongside and in a position to partly cover the hole in her side and the placing of the crew of the Dalzellea of mattresses and other available articles in the opening in the side of the float.

That the float and her cargo of livestock was saved was undoubtedly due to the prompt, skillful, and intelligent aid rendered by the Dalzellea and her crew; also to the fortunate circumstance that the master of the Dalzellea was so well acquainted with the facilities of the harbor as to know that at Governors Island there was a dock with runways for the discharging of livestock.

The services rendered by the Dalzellea and her crew were successful, for although they were unable to make the dry dock in Brooklyn before the float sank, they did succeed in reaching the shallower water in the vicinity of the dry dock so that the float was in a location and position where she could be raised and reconditioned for service; and the expense for raising and reconditioning the float has been taken into consideration in fixing her salvage value.

It is true that the entire operation in which the Dalzellea and her crew was engaged lasted only from about 7:55 to 11.30 a. m., and the period of the greatest danger lasted something less than thirty minutes. But the time element, as a basis of award in an instance of this particular character, is not the important factor; nor should this be looked upon as a mere harbor salvage where the risk to the salvor and the need of aid is ordinarily less urgent and the operation less dangerous than upon the high seas. The fact that the rescue was completed in a comparatively short time does not lessen the merit of the services under the circumstances. The Connemara, 108 U. S. 352, 2 S. Ct. 754, 27 L. Ed. 751; The West Mount, 277 F. 168 (C. C. A. 2).

■ In view of the property saved and all the circumstances, I think $6,000 is a fair award. Accordingly, the libelant may have a decree for that amount primarily against the Osprey and Eugene F. Moran, and secondarily against the respondent Central Union Stockyards Company.